No. 56,450

Lynn Eugene Cleveland, *Appellee,* v. David Wong, M.D., *Appellant.*

(701 P.2d 1301)

Opinion filed June 21, 1985.

*Debra J. Arnett* and *Alvin D. Herrington,* of McDonald, Tinker, Skaer, Quinn & Herrington, P.A., of Wichita, argued the cause, and *John E. Angelo* and *Quentin E. Kurtz,* of the same firm, were with them on the briefs for appellant.

*Edward J. Hund,* of Focht, Hughey & Hund, of Wichita, and *David M. Hall,* of Hall & Hall, of Anthony, argued the cause and were on the brief for appellee.

The opinion of the court was delivered by

MILLER, J.: This is an appeal in a medical malpractice action. The defendant, Dr. David Wong, a urologist, appeals from a judgment entered against him and in favor of his former patient, Lynn Eugene Cleveland, the plaintiff, after a jury trial in Sedgwick County. The issues urged on appeal include whether the plaintiff's claims were barred by the statute of limitations; whether the jury verdict was invalid for the reason that ten jurors did not agree on the specific act of negligence; whether the issues were properly submitted and the jury properly instructed; whether there was judicial misconduct which deprived defendant of a fair trial; whether expert handwriting testimony was required; whether the trial court erred in denying the defendant redirect examination of one witness; whether there was jury misconduct; and whether the verdict was excessive.

We shall first briefly state the facts, gleaned from the evidence when considered in the light most favorable to the successful party below. The trial consumed approximately twenty-eight trial days. The record consists of a like number of trial transcripts, many depositions and voluminous exhibits. Our statement of the facts is of necessity greatly condensed.

The plaintiff, a resident of Anthony, Kansas, was admitted to the Anthony hospital for treatment of a possible urinary tract infection on May 1, 1978. Dr. James Duffy of Anthony, the plaintiff's attending physician, called in the defendant, Dr. Wong, to examine the plaintiff. Dr. Wong examined him on May 2, and diagnosed plaintiff as suffering from a recurrent urinary infection, bladder neck obstruction, chronic papillary necrosis of bilateral kidney, and penile impotency. Dr. Wong did not attempt to combat plaintiff's urinary infection with known effective antibiotics. Instead, he recommended that the plaintiff undergo a surgical procedure known as a transurethral resection prostate (TUR).

Plaintiff was released from the hospital and then readmitted on May 18 for surgery. Both Dr. Duffy and Dr. Wong advised plaintiff that temporary urinary incontinence and sexual impotence were usual after such an operation, and the plaintiff signed an authorization for surgical treatment which states that the TUR operation carries with it a risk of post-operative urinary incontinence and sexual impotence. The defendant performed prostate surgery on May 19. On May 21, plaintiff's catheter was

removed and shortly thereafter he was released from the hospital. For over twenty months immediately following the surgery, plaintiff experienced incontinence and impotence. In fact, he still was incontinent and impotent at time of trial. Plaintiff claims that his incontinence and his impotency were needlessly caused by the negligence of the defendant.

Dr. Wong continued to treat plaintiff post-operatively and on October 24, 1978, performed a second TUR operation. Plaintiff understood that the purpose of this second surgical procedure was to correct his incontinence; Dr. Wong, however, wrote in his notes that the purpose was to perform a biopsy to rule out the possibility of cancer. The tissue removed was noncancerous. This second surgery did not correct plaintiff's incontinence. Finally, in the fall of 1979, plaintiff consulted Dr. Edward Bass of the Wichita Urology Group. Dr. Bass, a urological surgeon, conducted extensive examinations of the plaintiff and concluded that his incontinence was a direct result of his prior prostatic surgery. Dr. Bass found an obvious defect in the sphincter muscle, and tests disclosed that the muscle could no longer exert sufficient pressure to cause the normal retention of urine. As this defect cannot be corrected surgically, plaintiff is permanently incontinent. He wore an external penile or "Cunningham" clamp, prescribed by Dr. Wong, for many months. Later, he was fitted internally with a Rosen prosthesis by Dr. Bass; this lasted about twenty-one months. It is inserted surgically and requires an operation. He was wearing a penile clamp at the time of trial, and he is a candidate for another prosthesis, a Brantley-Scott, which will cost about $10,000. He is also permanently impotent, and that is related to his incontinence. A potency prosthesis is available, but Dr. Bass opined that plaintiff could not have both implanted at the same time and thus he must choose between incontinence or impotency.

During the first surgery, Dr. Wong removed the plaintiff's verumontanum, or "veru", which Dr. Wong testified was abscessed. The fact of removal and the claim that it was abscessed were not noted in the hospital records which Dr. Wong made at the time of the operation. Further, the report of a pathologist who examined the tissues removed by Dr. Wong failed to confirm that the veru was abscessed. The veru is described as an anatomical landmark without which a surgeon performing TUR surgery

does not know where to stop so as to avoid cutting the sphincter muscle and thus making the patient incontinent. There was extensive expert medical testimony that plaintiff's present condition is due to the negligence of the defendant in the performance of the initial TUR surgery.

As a result of Dr. Wong's surgery, the plaintiff has undergone several additional surgical procedures, will have more surgery and will incur substantial medical, surgical and hospital expense in the future, has lost time away from his business, is unable to have sexual relations with his spouse, must wear a penile clamp or other prosthesis, and has had many embarrassing accidents in public. The impact of plaintiff's condition on both the plaintiff and his wife has been dramatic.

## THE STATUTE OF LIMITATIONS

The first issue is whether or not plaintiff's claim is barred by the applicable statute of limitations. This is an action for medical malpractice and the defendant is a "health care provider" as that term is used in our statutes. K.S.A. 60-513(a)(7) establishes a two-year statute of limitations for an action arising out of the negligence of a physician or surgeon. This, however, is qualified by the following subsection of that statute. K.S.A. 60-513(c) provides:

"(c) A cause of action arising out of the rendering of or the failure to render professional services by a health care provider shall be deemed to have accrued at the time of the occurrence of the act giving rise to the cause of action, unless the fact of injury is not reasonably ascertainable until some time after the initial act, then the period of limitation shall not commence until the fact of injury becomes reasonably ascertainable to the injured party, but in no event shall such an action be commenced more than four (4) years beyond the time of the act giving rise to the cause of action."

An earlier version of this statute limited the commencement of such an action to not more than ten years beyond the time of the act giving rise to the cause of action. We construed the earlier version of this statute in *Hecht v. First National Bank and Trust Co.*, 208 Kan. 84, 490 P.2d 649 (1971). Syllabus ¶¶ 1 and 2 in the *Hecht* case read as follows:

"Under the provisions of K.S.A. 60-513 (now 1970 Supp.) a cause of action in malpractice does not accrue until such time as substantial injury results from the alleged acts of malpractice or until the fact of injury becomes reasonably ascertainable." Syl. ¶ 1.

"Where there is conflicting evidence as to when a cause of action is deemed to have accrued under 60-513, *supra,* the matter becomes an issue for determination by the trier of fact." Syl. ¶ 2.

The present statute provides that a cause of action against a health care provider accrues at the time of the occurrence of the act "unless the fact of injury is not reasonably ascertainable until some time after the initial act." In this case the initial surgery was performed May 19, 1978. The second opinion, that of Dr. Bass, was received on September 22, 1979. This action was commenced on August 14, 1980. The issue, then, was whether the fact of injury became reasonably ascertainable to the plaintiff immediately following the initial surgery. Defendant contends that as plaintiff was both incontinent and impotent immediately following that surgery, the fact of injury was reasonably ascertainable to him. This contention, however, overlooks the evidence that Dr. Wong, as well as plaintiff's personal physician, advised the plaintiff that temporary incontinence and impotence were normal immediately following TUR surgery. Thus, while plaintiff knew that he was both incontinent and impotent immediately after the surgery, he had no reason to suspect that those conditions were permanent or that those conditions were the result of any negligence or malpractice on the part of the defendant. The evidence and the positions of the parties presented an issue of fact and the trial court properly submitted this issue to the jury by its instruction No. 20, which reads as follows:

"The defendant claims that the plaintiff failed to file his lawsuit against the defendant in the time allowed by law for the filing of such suit. You are instructed that the date the lawsuit was filed was August 14, 1980.

"Kansas law provides that the two-year period of limitation in this case began to run on the date the 'fact of injury became reasonably ascertainable' to Mr. Cleveland. If you find the fact of injury became reasonably ascertainable to Mr. Cleveland before August 14, 1978, then he did not file his lawsuit in the time provided by law and the answer to the special question is 'no'; if you find that the fact of injury did not become reasonably ascertainable to Mr. Cleveland until on or after August 14, 1978, then he did file his lawsuit in the time allowed by law and the answer to the special question is 'yes.'

"The defendant has the burden to prove that this claim is more probably true than not true."

A special question was submitted to the jury as follows: "Did Eugene Cleveland file this lawsuit within the time period permitted by law?" The jury answered, "Yes." This was a fact issue;

there was substantial competent evidence to support the answer to the special question returned by the jury. The symptoms of the injury were known to the plaintiff, but the fact of injury was not reasonably or immediately ascertainable. We conclude that the action was timely filed.

## THE JURY VERDICT

The trial judge instructed the jury on the issues. Included was an instruction which informed the jury that plaintiff claimed that he sustained injuries and damages due to the fault of Dr. Wong, and that in order for the plaintiff to recover he must prove that Dr. Wong was negligent; that the plaintiff was injured or sustained damages; and that one or more of the acts of negligence claimed caused or contributed to the plaintiff's injuries or damages. Six separate claims of negligence were set forth in the instruction. They were:

"1. That Dr. David Wong was negligent. The plaintiff alleges that Dr. Wong departed from the standard of care and was therefore negligent in one or more of the following respects:

a. By failing to prescribe an appropriate antibiotic to clear a prostatic infection;

b. By performing surgery without adequate medical justification;

c. By performing surgery without first prescribing an adequate and appropriate course of antibiotics;

d. By overresecting the plaintiff's prostate during TUR surgery causing injury to the sphincter mechanism;

e. By exposing the plaintiff to TUR surgery for the purpose of performing a biopsy when a needle biopsy procedure was appropriate;

f. By causing injury by resection or cauterization to the sphincter mechanism during TUR surgery."

The jury in this case consisted of thirteen members rather than the usual twelve, the parties having agreed that an alternate juror who was regularly selected and had sat throughout the entire trial would be permitted to participate fully in the jury deliberation, and that the agreement of ten jurors would be sufficient to render a verdict. See K.S.A. 60-248. After some deliberation, the jury sent the following question to the trial judge:

"Question: Concerning p. 3, item 1

"DOES jury vote on any subitem, i.e., 1.a, 1.b, etc., have to be 10-3 or simple majority.

"Can jury vote on item 1, in total, DOES jury vote have to be 10-3 or simple majority.

Jerry O. Lawrence
Sept. 22, 1983"

After consulting with counsel the trial judge responded as follows:

"There is no established or required procedure that will govern your deliberations, but you may find it helpful to utilize the following format, considering the instructions and the evidence:

"STEP 1. Vote by ballot on the following question: 'Was Dr. Wong negligent?' If ten of you believe he was negligent, go to STEP 2. If ten of you believe he was not negligent, answer question one on your verdict form 'no' and go to STEP 5.

"STEP 2. Vote by secret ballot on the following question: 'Has causation been established?' If ten of you believe causation has been established, go to STEP 3. If ten of you believe causation has not been established, answer question one on your verdict form 'no' and go to STEP 5.

"STEP 3. Determine the comparative negligence, if any, of Dr. Wong and Dr. Bass and go to STEP 4.

"STEP 4. Determine the amount of damages sustained by Gene Cleveland and Diane Cleveland and go to STEP 5.

"STEP 5. Answer the Special Question."

Four days later, on September 26, 1983, the jury returned its verdict. It assessed 100% of the fault to Dr. Wong, fixed the plaintiff's damages at $698,506.26, and Mrs. Cleveland's damage for loss of consortium at $325,000.

Defendant argues that the answer given by the trial judge to the jury's question was erroneous and that it permitted the jurors to agree that the defendant was negligent without agreeing upon a specific act of negligence. He contends that no ten jurors agreed upon any one specific negligent act. In connection with the motion for new trial, the defendant produced affidavits of three of the jurors which support his contention. In response, the plaintiff produced affidavits of the remaining ten jurors, apparently from the ten jurors who found the defendant causally negligent and who supported the verdict. These contradict the affidavits secured by the defendant and indicate that the ten jurors agreed upon at least one of the grounds of negligence, with at least one of the jurors finding the defendant guilty of all of the acts charged.

The issue before this jury was whether the defendant, in his treatment of his patient, breached his duty and departed from the proper standard of care and was thus negligent; that the patient was damaged; and that the defendant's negligence caused the patient's damages. The trial court properly set out, in its instruc-

tions to the jury, the various claims of the plaintiff as to the defendant's breach of duty which found support in the evidence. See *Natanson v. Kline*, 186 Kan. 393, 398-400, 350 P.2d 1093, *reh. denied* 187 Kan. 186 (1960). Ten members of the jury found that the defendant breached the duty which he owed to his patient; that he was negligent; that his negligence caused injury to the patient; and that the patient sustained damages, which he is entitled to recover as against the defendant. The verdict was properly received, the jury was polled, and all thirteen jurors responded that the verdict returned was that of at least ten jurors.

The issue which we now face is this: Must all of those jurors who return a verdict in a negligence case agree upon the specific act of negligence which caused the damage? In the old case of *Barker v. Railway Co.*, 89 Kan. 573, 132 Pac. 156 (1913), the plaintiff contended that his orchard was destroyed by a fire set by the defendant in the operation of its railroad. He claimed and the jury found that the fire originated from the engine. The railroad requested that the court give the jury some 33 special questions, and in particular that the court require the jury to determine whether the fire was caused by defective equipment, or by improper operation. In reversing the trial court, this court said:

"We can not agree with the contention of plaintiff's counsel, that if half of the jurors believed the fire was caused by a defect in the engine and the other half that it was caused by improper operation, the plaintiff would still be entitled to recover. If this were true there might be a consensus of opinion as to the liability of the defendant on twelve different bases on which such opinion could rest, each relied on by only one of the jurors and none by all. Their unanimous opinion as to the essential facts of the case as well as to the general result must be in favor of the prevailing party. The statutory right to have proper questions submitted having been denied, the defendant did not have the kind of trial it was entitled to." 89 Kan. at 576-77.

Of course, the statutory right to have the court submit special questions to the jury, formerly included within our civil code (see R.S. 1923, 60-2918 and earlier statutes cited therein), no longer exists. However, we disagree with the rationale of *Barker*. In a negligence case involving automobiles, if half of the jurors determine that the defendant failed to keep a proper lookout, and that such failure caused the collision and plaintiff's resulting injuries and damages, and the other half of the jurors determine that the defendant ran a stop sign, thus causing the collision and the injuries complained of, and assuming that there is evidence

to support both, should the plaintiff be denied recovery? In a surgical malpractice case, if half of the jurors believe that the surgeon left a sponge in the incision and the other half believe that he left gauze rather than a sponge in the patient, and assuming that the evidence would support either finding and that the surgeon's omission caused the damage, should recovery be denied? We think not. If a jury finds a defendant negligent *in one or more* of the claims of negligence upon which there is competent substantial evidence, and further finds that the plaintiff sustained damages as a direct result of the defendant's negligence, that is sufficient. If the requisite number of jurors are unanimous in finding causal negligence, that is sufficient. We find no recent cases supporting the rationale of *Barker*, and we decline to follow it. Unanimity upon the specific negligent act or omission is not required.

## THE IMPOTENCE CLAIM

Defendant contends that there was insufficient evidence upon which to submit the impotence claim to the jury. Plaintiff contended that he was not impotent prior to Dr. Wong's initial surgery, and that Dr. Wong's diagnosis of penile impotency following his initial examination of the plaintiff was erroneous. It is interesting to note that Dr. Wong claims that his initial diagnosis of impotency was based upon statements of the plaintiff— the case history—but Dr. Wong now contends that impotency must be supported by expert medical opinion and not merely by case history. Plaintiff presented the testimony of himself and his wife, as well as the opinion of Dr. Bass, in support of his impotency claim. Plaintiff's impotency is clearly tied in with and a part of his incontinency claim. He is not contending that he is sterile as a result of Dr. Wong's negligent surgery, only that he is unable to maintain an erection and have normal sexual intercourse. As Dr. Bass testified, "It's very difficult to maintain a satisfactory sexual relationship when you are constantly in fear of urinating on your sexual partner." Dr. Bass is a urologist; he would be familiar with the effects of incontinence; he was qualified to give his opinion as to the cause of plaintiff's impotence. We conclude that the evidence was sufficient on this issue to permit it to go to the jury.

## JUDICIAL MISCONDUCT

Under this section of his brief, defendant contends that the trial judge exhibited both verbal and nonverbal conduct which was prejudicial to the defendant; that the trial judge erred in submitting the issue of lost wages to the jury; that the judge erred in permitting plaintiff to present expert testimony outside the scope of the pretrial order; and that he erred by permitting the plaintiff to offer evidence of specific acts of negligence to impeach the credibility of the defendant, in direct violation of K.S.A. 60-422(d).

He first contends that the judge's facial expressions and demeanor showed favoritism toward the plaintiff. This was not called to the judge's attention during trial, no objections were made, and there is little in the record to support this argument. As to verbal conduct, we have carefully read those portions of the record which the defendant contends support his claim of judicial misconduct, but we find nothing in the judge's remarks to reflect favoritism toward plaintiff or disdain toward defendant. This was a lengthy and difficult trial; there was much expert testimony, and the subject matter presented difficult issues. The trial judge, as would any judge presiding over a several-weeks trial, perhaps made some comments which in retrospect he could better have couched in other language or withheld altogether. However, we find nothing in the record which approaches prejudicial or reversible conduct. We find this issue to be without merit.

Mr. Cleveland was not a wage earner, but he and his wife operated a laundry and dry cleaning establishment. The trial court properly submitted to the jury, as an item of damages that could be considered, "[t]he value of the time [plaintiff] has lost to date by reason of his disabilities and that which he is reasonably certain to lose in the future." Defendant did not object to that instruction. The instruction was taken from PIK Civ. 2d 9.01, and was appropriate in this case. The verdict submitted to the jury did not break down the separate items which the jury may have considered, but an affidavit secured by defendant from one of the jurors after trial indicated that the jury included in its damage award to the plaintiff the sum of $8,000 for "lost time or wages lost." Since the issue of lost time was properly submitted to the jury for its consideration, and since there was evidence of time lost by the plaintiff from his business and evidence that he

would lose time in the future, and since there was no objection to this instruction, there was no error.

As to the expert testimony, defendant contends that Dr. Bass should not have been permitted to express expert opinions since plaintiff listed him as a witness but not as one of his expert witnesses. Dr. Bass was, however, listed as an expert witness by the defendant, and the pretrial order provided that any witness used by one party might be used by the other. Dr. Bass's reports and the notes of his examinations of the plaintiff were available to the defendant, and his testimony came as no surprise. His qualifications as an expert are not challenged. Under this argument, defendant also contends that one of the experts was permitted to express opinions which were not expressed during the taking of his deposition. These matters, however, were relevant, and could well have been anticipated.

Finally, under this subheading, defendant contends that the trial court erred in receiving evidence of specific instances of defendant's credibility. We have read those portions of the record which defendant cites in connection with this argument, and find that no objection to the evidence was made citing K.S.A. 60-422(d), and further, that the evidence was not offered for the purpose of attacking credibility. The evidence goes to the procedures used by the defendant in treating another patient, and has nothing to do with his credibility. We find no error.

### THE NEED FOR A HANDWRITING EXPERT

Plaintiff claimed that the defendant altered and added to the record of his notes, and that he had made additions to his hospital notes after the original writings had been completed. The record in question shows on its face writing through signatures, along the margin, and at the end of notes, obviously made with a different writing instrument. Plaintiff originally engaged a handwriting expert, but did not call him at trial. Defendant, in his testimony, admitted that he had made changes in and additions to the original record. He passed out copies of the "altered" documents and explained to the jury in detail how, why and when he had made the changes. Since the changes were admitted, plaintiff had no need to call a handwriting expert to confirm his claim that the defendant changed the record.

Defendant calls our attention to the fact that plaintiff consulted a handwriting expert, listed him as a witness, but failed to call

him at trial. Defendant contends that upon this state of facts, defendant is entitled to the presumption that the testimony of the expert would have been favorable to the defendant, or at least adverse to the party choosing not to produce it. In *Londerholm v. Unified School District,* 199 Kan. 312, 323-24, 430 P.2d 188 (1967), we said:

"Under the law of Kansas as found in numerous cases . . . when a party to a case has failed to offer evidence or produce witnesses within his power to produce, an inference arises that the evidence or testimony which would have been produced would have been adverse to that party."

The rule, however, applies only to evidence or information peculiarly within the reach or control of the party failing to offer it. *Armstrong v. City of Salina,* 211 Kan. 333, 339, 507 P.2d 323 (1973), and cases cited therein; and *In re Ratner,* 194 Kan. 362, 366-67, 399 P.2d 865 (1965). Here, the issues relating to the hospital records were: Was the record changed after it was initially written by the defendant? And, if so, when were the changes made? The fact that changes and additions to the record were made is obvious from an examination of the documents. During his direct examination, Dr. Wong went over every record which plaintiff claimed was changed, and admitted that he made changes in and additions to the records, and he testified as to when he made the changes. He admitted that these alterations were made after the original notes were completed, but said that the changes were made before plaintiff left the hospital. Thus, the facts to which the expert would have testified—that changes were made after the original notes were prepared—was as much if not more in the control of the defendant, who made the changes, as it was within the reach or control of the plaintiff, who had only expert opinion, not positive evidence of the maker, within his control. Under these circumstances, the trial court did not err in refusing to apply the presumption. Further, the trial court did not err in permitting plaintiff's counsel, in opening statement, to state that there were some "very curious" entries in the hospital records, which appeared to have been changed after the original entries were made. Such was admittedly the fact.

## DENIAL OF REDIRECT EXAMINATION OF DR. WONG

The defense began the direct examination of Dr. Wong on August 30. That examination was interrupted at various times

and the testimony of eight other witnesses was presented. Finally, on September 13, the cross-examination of the defendant was completed. At that time, the defendant asked that he be permitted to interrupt his testimony again and that another defense witness, Dr. Schwarz, be recalled for the completion of his direct examination—which had begun some two weeks earlier. The trial court ruled that the defense must complete the examination of Dr. Wong without interruption; it would not permit the further removal of the defendant from the stand for the purpose of hearing the testimony of another defense witness. Faced with that alternative, the defense chose to forego the redirect examination of the defendant and to call Dr. Schwarz as its next witness. From this abbreviated statement it is obvious that the trial court exhibited considerable latitude in permitting the defendant to interrupt the testimony of one defense witness with the testimony of another. It was only when these interruptions became almost commonplace that the trial court determined that there be no more interruptions in the order of proof. The judge's order did not prevent the defendant from continuing with the redirect examination of Dr. Wong in orderly fashion; the order merely prescribed the usual order of proof.

In *State v. Rider, Edens & Lemons,* 229 Kan. 394, 625 P.2d 425 (1981), Chief Justice Schroeder summarized the rules relating to the order of proof in Syllabus ¶ 11:

"There should always be an orderly presentation of proof. Rules pertaining thereto, however, are directory and not mandatory. An alteration in the prescribed customary order of proof rests in the sound discretion of the trial court, and its ruling will not be disturbed on appeal unless its exercise of the power of discretion is abused."

We have not overlooked the authorities cited and the arguments advanced by the appellant, but upon review of the record in this case it is apparent that the trial judge attempted to accommodate the defense in the presentation of its case by interrupting the orderly presentation of evidence time after time. The trial judge did not abuse his discretion in making the ruling of which the defendant now complains.

## THE JURY INSTRUCTIONS

The trial court, in its instruction to the jury on loss of consortium, advised the jury that it might consider as one of the elements of damage:

"The mental anguish, emotional upset, anxiety, and suffering already experienced by Mrs. Cleveland and reasonably probable to be experienced by Mrs. Cleveland in the future as a result of any loss of consortium arising from injury to Mr. Cleveland."

Defendant argues that this instruction permits the jury to consider and award damages for mental anguish, emotional upset, and anxiety, items not included within the statute, K.S.A. 23-205, or in the PIK Instructions, PIK Civ. 2d 9.02. In *Clark v. Southwestern Greyhound Lines,* 144 Kan. 344, Syl. ¶ 1, 58 P.2d 1128 (1936), we said:

"In an action brought by a husband to recover damages on account of injuries to his wife it is held that the terms 'services' and 'domestic duties' as used in R.S. 23-205 mean all the benefits that accrue as the result of the conjugal relation, such as society, comfort, aid, assistance, or any other act that tends to make wedded life worth while; and further that the statute does not permit a distinction to be drawn between services a wife gives her husband and the companionship she affords him."

The same terms, *services and domestic duties,* are still contained within K.S.A. 23-205. Included within those terms are not only the performance of acts of manual labor about the house—taking out the trash, making repairs, drying dishes, and the like—but the performance of matrimonial, conjugal and connubial acts and duties, including social obligations, affection, and sexual relations. There was evidence to support the direct mental and emotional effect of the plaintiff's incontinence and impotence upon Mrs. Cleveland. Affection and sexual intercourse have a direct relationship to one's mental and emotional well being. Affection is emotion or an expression of emotion. Webster's Third New International Dictionary defines affection as *a strong emotion.* The matter might well have been left to oral argument but, under the peculiar facts of this case, the instruction was not erroneous.

Defendant contends that the trial court erred in instructing the jury on informed consent when plaintiff asserted no claim based upon lack of informed consent. The court's instruction, however, ends with the statement to the jury that:

"The plaintiff makes no claim for damages as a result of a lack of informed consent and you may not consider informed consent as a negligence claim."

There was an abundance of evidence as to the information given to plaintiff by the defendant and plaintiff's personal physician

prior to the surgery. The matter was relevant on the issue of whether plaintiff had knowledge of injury and thus whether the statute of limitations barred the action. The trial court's instruction was clear and was not erroneous.

Defendant complains about the trial court's issues or "fault" instructions. We have examined the instructions given and those proposed by the defendant. A full discussion would merely prolong this opinion. We conclude that the jury was fully and properly instructed. The comparative fault instruction directed the jury to determine the fault, *if any*. The jury was clearly made aware that they could find Dr. Wong was not at fault, and that unless plaintiff established to the satisfaction of the jury that Dr. Wong was negligent, that his negligent conduct caused plaintiff's injuries and damages, and that plaintiff actually sustained such damages, he could not recover. We find no error.

The trial court gave an instruction on false testimony, following PIK Civ. 2d 2.24. There was some testimony which was not consistent with medical records, and which the jury could have considered as false. Hence, there was no error in giving this instruction.

Finally, defendant complains of the court's instruction on the care and skill required of an expert because that instruction did not refer to the care and skill required of a like specialist in the same or a similar community. Dr. Wong is a specialist in urology. A specialist has the duty to use the care and skill of a specialist in the same speciality; the standard is broad-based and need not be tied to the small community in which the speciality is practiced. See the comments following PIK Civ. 2d 15.01. We find no error in the jury instructions.

## THE CLAIM OF JURY MISCONDUCT

Defendant claims that the jury was guilty of misconduct necessitating a new trial. This claim is based on (1) improper reading material in the jury room, and (2) the fact that one juror was a nurse who, defendant claims, used her nursing knowledge to influence the jury.

The reading material consisted of a newspaper article, which was published in Wichita during the trial, and articles published in the Reader's Digest. The affidavits of three jurors, provided by the defendant upon his motion for a new trial, stated that the newspaper article was "referred to" during the jury delibera-

tions. Other jurors reported that yes, it was mentioned, but after one juror said that it should not be considered, it was never mentioned again. The article described the Kansas Health Care Stabilization Fund, a ten-million-dollar fund set up by the state to augment the malpractice insurance coverage which physicians are required to carry. The article stated that the fund was at its lowest point in four years, and that there were 531 claims pending against it. It would seem that the article would prejudice the plaintiff, not the defendant. However, there is no evidence, by affidavit or otherwise, that the article was *considered* by the jurors in their deliberations. Jury misconduct will not constitute a ground for reversal unless it is shown to have substantially prejudiced the rights of a party. *State v. Arney,* 218 Kan. 369, 371-72, 544 P.2d 334 (1975). Here there is no showing that the article had any effect upon these jury deliberations.

Similarly, a post-trial affidavit stated that one of the copies of the Reader's Digest, which had been left in the jury room for jurors to read during recesses, contained an article on prostate surgery. There is no showing that any of the jurors read the article or that it was quoted, utilized, or discussed during jury deliberations. One of the jurors discovered it, showed the title of the article to another, and the jurors generally knew of its existence; but there is nothing in the evidence to indicate that the magazine article was considered or played any part in the jury deliberations.

Finally, defendant contends that one of the jurors, a licensed practical nurse, improperly used her professional knowledge to influence other jurors. The three affidavits of jurors provided by the defendant state that this juror answered questions of other jurors regarding medical terminology, and that she used her nursing knowledge in arguing that Dr. Wong was negligent. Other jurors deny that she exerted any influence over the panel because of her nursing background. The defendant does not claim that he was not aware of the juror's nursing background or that it was not fully disclosed and explored during voir dire. It should come as no surprise that a juror with that background would be familiar with some medical terms unfamiliar to other jurors, or that the juror's past experience and training might enter into her decision-making process. However, we find nothing in the record to indicate prejudicial misconduct by this juror. We

conclude that the defendant has not demonstrated any prejudicial misconduct on the part of this trial jury.

## EXCESSIVENESS OF THE VERDICT

Defendant, for his final point, argues that the verdict is excessive. The controlling rule is set forth in the unanimous opinion of Justice Fontron in *Kirk v. Beachner Construction Co., Inc.,* 214 Kan. 733, 522 P.2d 176 (1974):

"Our rule relating to excessive verdicts is not obscure. It has frequently been discussed and is succinctly stated in *Langley v. Byron Stout Pontiac, Inc.,* 208 Kan. 199, 202, 491 P.2d 891:

'When a charge of excessive verdict is based on passion or prejudice of the jury and depends for support solely on the amount of the verdict, the trial court will not be reversed for refusing a new trial unless the amount of the verdict in the light of the evidence shocks the conscience of the appellate court. *(Knoche v. Meyer Sanitary Milk Co.,* 177 Kan. 423, 280 P.2d 605; *Neely v. St. Francis Hospital & School of Nursing,* 188 Kan. 546, 363 P.2d 438; *Slocum v. Kansas Power & Light Co.,* 190 Kan. 747, 378 P.2d 51.)'

See, also, *Riggs v. Missouri-Kansas-Texas Rld. Co.,* 211 Kan. 795, 802, 508 P.2d 850; *Barnes v. St. Francis Hospital & School of Nursing,* 211 Kan. 315, 321, 507 P.2d 288; *Ketner v. Atchison T. & S.F. Rly. Co.,* 212 Kan. 453, 454, 510 P.2d 1220; *Pike v. Roe,* 213 Kan. 389, 390, 516 P.2d 972.

"But the rule, like many others in the field of law, is more difficult to apply than to state. It is not open to doubt that a verdict so excessive and disproportionate to the damages sustained as to be unconscionable would be abhorrent to the law. The difficulty, of course, when it comes to applying the rule, is simply this: What is unconscionable is not subject to precise and unequivocal definition. What is shocking to the conscience depends upon the amount of the verdict as related to the facts and circumstances of a given case." 214 Kan. at 736.

And see *Ingram v. Howard-Needles-Tammen & Bergendoff,* 234 Kan. 289, 299, 672 P.2d 1083 (1983).

In the case now before us, the injury sustained by the plaintiff is substantial, severe, and permanent. The causal negligence of the defendant is clearly established. The effect upon the plaintiff and his wife has been and will continue to be severe. The verdict, though substantial, does not shock the conscience of this court.

The judgment is affirmed.