No. 63,436

BRENDA HUMES and BENNIE HUMES, *Appellees/Cross-appellants,*
v. DALE L. CLINTON, M.D.; DALE L. CLINTON, M.D., P.A.;
*Appellants/Cross-appellees,* and ALZA CORPORATION,
*Appellant.*

(792 P.2d 1032)

Opinion filed May 25, 1990.

*Cynthia J. Sheppeard,* of Fisher, Heck & Cavanaugh, P.A., of Topeka, argued the cause and was on the briefs for appellant ALZA Corporation.

*Thomas E. Wright,* and *C. Steven Rarrick,* of Davis, Wright, Unrein, Hummer & McCallister, of Topeka, were on the briefs for appellant/cross-appellee Dale L. Clinton, M.D.

*John W. McClelland,* of Wirken & King, P.C., of Kansas City, Missouri, argued the cause, and *Shelley Hickman Clark,* of Lawrence, was with him on the briefs for appellees/cross-appellants.

The opinion of the court was delivered by

HERD, J.: This is a medical malpractice and products liability case brought by Brenda and Bennie Humes on behalf of their nonviable fetus, as heirs at law of the fetus, and individually against Dale L. Clinton, M.D., and ALZA Corporation. Appellants Clinton and ALZA Corporation have perfected an interlocutory appeal of the district court's ruling denying them summary judgment on appellees Humes' claim for wrongful death, pain and suffering, strict liability, and negligence per se. Appellees Humes cross-appeal the district court ruling granting summary judgment to Dr. Clinton on Brenda Humes' claim for emotional and physical injuries resulting from a previous abortion.

In reviewing a summary judgment, we must consider the record in the light most favorable to the party against whom summary judgment was entered. *Mick v. Mani,* 244 Kan. 81, 83, 766 P.2d 147 (1988); *Johnston v. Elkins,* 241 Kan. 407, 736 P.2d 935 (1987). The district court found the following facts uncontroverted or most favorable to the Humes:

1. Defendant ALZA Corporation (ALZA) is the manufacturer of an intrauterine contraceptive device (IUD) known as the Progestasert Intrauterine Progesterone Contraceptive System (IPCS). The IPCS is a T-shaped IUD with progesterone (a female hormone) in the vertical stem which is released over time. The IPCS is inserted by a physician into the patient's uterus for purposes of contraception.

2. The IPCS is approved by the Food and Drug Administration (FDA) for use for 12 months, with replacement recommended

after that time. The physician information sheet prepared by ALZA states that the physician "should" provide the patient the patient information sheet and discuss with the patient the use of the IPCS. The physician information sheet and patient information sheet provide notice that pregnancy can occur with use of the IPCS and that for continued protection the system must be replaced after twelve months of use because the "contraceptive effectiveness of the system is retained for one year."

3. Brenda Humes had an IPCS inserted by Dr. Clinton on June 4, 1985.

4. Even though Dr. Clinton knew the IPCS was recommended for replacement after one year, he did not inform Brenda Humes of this nor did he give the patient information sheet prepared by ALZA to her.

5. Instead, Dr. Clinton gave Brenda Humes an information sheet prepared by himself. This written material included language that "pregnancies are rare" and that the IUD "should be changed about every 15 months." Another sheet of information prepared by Dr. Clinton and given to Brenda Humes instructed her to replace the IUD before 16 months because the "progesterone runs out by this time."

6. Dr. Clinton told Brenda Humes that none of his patients had ever gotten pregnant while using the IPCS and that she would not get pregnant using the IPCS for at least fifteen months.

7. Dr. Clinton admitted that ALZA informed him pregnancy could occur with the IPCS.

8. Brenda Humes followed the advice of Dr. Clinton concerning the length of time she could use the IUD for contraception. On or about August 6, 1986, or fourteen months after Brenda Humes had had the IUD inserted, she became pregnant. Her pregnancy was confirmed on September 6, 1986, by Henry Buck, M.D.

9. Brenda Humes' pregnancy was complicated by the presence of the IPCS, which exposed her to increased risk of infection, spontaneous abortion, septic shock, and death.

10. Brenda Humes suffered pain and bleeding throughout the term of her pregnancy with the IUD in place.

11. For strong medical considerations, Dr. Buck recommended that Brenda Humes terminate her pregnancy.

12. On November 4, 1986, after being advised on numerous occasions that there were substantial life-threatening risks in continuing the pregnancy, Brenda Humes underwent a therapeutic abortion. The fetus was sixteen and one-half weeks and could not have survived outside the mother's body at that time. Thus, the fetus was nonviable.

13. Since the abortion, Brenda Humes has suffered continued physical and psychological distress. She is presently diagnosed as suffering from pelvic inflammatory disease, post-traumatic stress disorder, and post-abortion syndrome.

Additional facts will be presented where pertinent to a proper explanation of the case.

The first issue we consider is whether the district court erred in ruling that Brenda and Bennie Humes could maintain wrongful death and survival actions on behalf of an unborn, nonviable fetus. Dr. Clinton and ALZA contend these actions are not proper as a matter of law because no cause of action may be brought on behalf of an unborn, nonviable fetus.

Under this state's wrongful death statute, the personal representative of a person killed by the wrongful act or omission of another may maintain an action for damages resulting from the negligent act if the decedent might have maintained the action had he or she lived. K.S.A. 60-1901. Thus, our ultimate inquiry is whether an unborn, nonviable fetus is a "person" within the meaning of the wrongful death statute.

At common law, the courts did not recognize a right of action for prenatal personal injuries. *Scott v. McPheeters*, 33 Cal. App. 2d 629, 635, 92 P.2d 678. In 1884, Justice Holmes, speaking for the Supreme Judicial Court of Massachusetts, held that a child *en ventre sa mere* had no jurisdictional existence; that is, the unborn fetus was so intimately united with its mother that no separate right of action could accrue to the unborn fetus. *Dietrich v. Northampton*, 138 Mass. 14 (1884). The *Dietrich* holding remained substantially unchallenged until 1946, when a United States District Court allowed recovery for a child born alive who had sustained prenatal injuries while viable. *Bonbrest v. Kotz*, 65 F. Supp. 138 (D.D.C. 1946). Minnesota was the first state to allow a wrongful death action on behalf of a stillborn child who

sustained injuries while viable. *Verkennes v. Corniea,* 229 Minn. 365, 38 N.W.2d 838 (1949).

Following the *Verkennes* decision, other states began to adopt the view that a wrongful death action would lie when an independent life in being was negligently injured by the wrongful act of another; however, these early cases usually limited recovery to children who survived birth. *Keyes v. Construction Service, Inc.,* 340 Mass. 633, 165 N.E.2d 912 (1960); *Carroll v. Skloff,* 415 Pa. 47, 202 A.2d 9 (1964); *Simmons v. Weisenthal,* 29 Pa. D. & C. 2d 54 (1962); *Hall v. Murphy,* 236 S.C. 257, 113 S.E.2d 790 (1960).

More recently, some courts have expressed a view that an action may be maintained for prenatal injuries negligently inflicted at any stage of gestation, provided the child is born alive. *Group Health Ass'n v. Blumenthal,* 295 Md. 104, 117-19, 453 A.2d 1198 (1983); Annot., 40 A.L.R.3d 1222, 1230 § 3[a]. In such cases, it is reasoned that viability—the ability to live independently of the mother—is an irrelevant demarcation when a child survives prenatal injuries and is born with damages suffered within the womb. Other courts reason it is incongruous to recognize an unborn fetus as alive and capable of inheriting, but to reject it as capable of sustaining personal injuries. *Wolfe v. Isbell,* 291 Ala. 327, 332, 280 So. 2d 758 (1973); *Tucker v. Carmichael & Sons Inc.,* 208 Ga. 201, 204, 65 S.E.2d 909 (1951); *Bennett v. Hymers,* 101 N.H. 483, 485, 147 A.2d 108 (1958).

A majority of states allow an action for wrongful death of a viable fetus even when it is stillborn as a result of the prenatal injuries. Kansas adopted this rule in *Hale v. Manion,* 189 Kan. 143, 368 P.2d 1 (1962). In *Hale,* a pregnant woman involved in an automobile accident gave birth several days after the accident and delivered a "perfectly formed male child" that did not survive birth. 189 Kan. at 144. The court found that on the date of the alleged negligent act the child was *viable* and ruled that an action for wrongful death could be maintained. 189 Kan. at 146-47.

The *Hale* opinion, like other jurisdictions where actions are maintainable for stillborn children, limits recovery to those fetuses which are viable when injured. The *Hale* court relied upon an Ohio case for support (*Williams v. Transit, Inc.,* 152 Ohio St. 114, 87 N.E.2d 334 [1949]), which stated that a viable fetus was

capable of an independent existence and therefore should be regarded as a separate entity capable of maintaining an action in its own right. Many other states have adopted a similar rationale in limiting recovery to a fetus that was viable when injured. *Rice v. Rizk,* 453 S.W.2d 732 (Ky. 1970); *State v. Sherman,* 234 Md. 179, 198 A.2d 71 (1964); *White v. Yup,* 85 Nev. 527, 458 P.2d 617 (1969); *Amadio v. Levin,* 509 Pa. 199, 501 A.2d 1085 (1985); *Fowler v. Woodward,* 244 S.C. 608, 138 S.E.2d 42 (1964); *Kwaterski v. State Farm Mut. Automobile Ins. Co.,* 34 Wis. 2d 14, 148 N.W.2d 107 (1967); Annot., 84 A.L.R. 3d 411, 422 § 3[a].

Several courts have expressly ruled that no action can be maintained for the stillbirth of an injured nonviable fetus, reasoning that a nonviable fetus is not a separate entity and thus is not capable of independent life. *Estate of Baby Foy v. Morningstar Beach Resort,* 635 F. Supp. 741 (D. V. I. 1986); *Mace v. Jung,* 210 F. Supp. 706 (D. Alaska 1962); *Renslow v. Mennonite Hospital,* 40 Ill. App. 3d 234, 351 N.E.2d 870 (1976), *aff'd* 67 Ill. 2d 348, 367 N.E.2d 1250 (1977); *Toth v. Goree,* 65 Mich. App. 296, 237 N.W.2d 297 (1975), *lv. to appeal denied* 396 Mich. 836 (1976); *Poliquin v. MacDonald,* 101 N.H. 104, 135 A.2d 249 (1957); *West v. McCoy,* 233 S.C. 369, 105 S.E.2d 88 (1958).

The district court in the present case stated that a great number of states recognize wrongful death actions on behalf of unborn children "regardless of viability." After careful review of the cases relied upon to support this conclusion and in light of the discussion above, we find the district court in error.

All of the cases relied upon by the district court dealt with negligently injured viable fetuses either stillborn or who died shortly after birth. In *Presley v. Newport Hospital,* 117 R.I. 177, 365 A.2d 748 (1976), the Rhode Island Supreme Court considered whether parents could bring a wrongful death action on behalf of their stillborn child where the negligently inflicted injuries occured while the child was an unborn, viable fetus. 117 R.I. at 179. The *Presley* court ruled that the action was maintainable and further stated gratuitously that "the decedent, whether viable or nonviable, was a 'person' within the meaning of the Wrongful Death Act." 117 R.I. at 188. This statement supports the position that an unborn, nonviable fetus is a "person" within the wrongful death statute. However, the *Presley* case dealt with a viable fetus.

The statement is dicta and therefore is not precedent for the court's ruling in the present case.

The district court stated that viability is not a logical distinction because a tortfeasor who prevents a nonviable fetus from becoming viable is held less responsible than if his or her negligence prevents a live birth of a viable fetus. As we have previously pointed out, viability is an improper condition precedent to recovery when the injured fetus is born alive. *Group Health Ass'n v. Blumenthal,* 295 Md. at 116. However, viability is not an illogical condition precedent when a negligently injured fetus is stillborn. A nonviable fetus is not capable of living outside its mother's womb; it cannot maintain a separate and distinct existence. Thus, a nonviable fetus which dies before birth has never become an independent living person. *Toth v. Goree,* 65 Mich. App. at 300, (citing *O'Neill v. Morse,* 385 Mich. 130, 188 N.W.2d 785 [1971]). In *Hale v. Manion,* 189 Kan. 143, this court ruled that an unborn, viable fetus was a "person" within the meaning of the wrongful death statute because it was capable of an independent existence and regarded as a separate entity. 189 Kan. at 145.

The *Hale* opinion is not supportive of the proposition that an action may be maintained on behalf of an unborn, nonviable fetus. A nonviable fetus is not a distinct entity; rather, its life is an integral part of its mother's life. Therefore, we find viability an appropriate condition precedent to liability for wrongful death under K.S.A. 60-1901. We further believe the public policy decision to extend liability under the wrongful death act is properly left to the legislature.

We conclude that an unborn, nonviable fetus is not a "person" within the definition of the wrongful death act and is incapable of bringing an action on its own behalf. We further rule that the Humes are thus not authorized to maintain a survival action to recover for the alleged pain and suffering of the nonviable fetus.

The next issue we consider is the Humes' cross-appeal as to whether the district court erred in granting Dr. Clinton's motion for summary judgment on Brenda's claim for emotional and physical damages from a previous abortion. In reaching its decision, the district court considered these additional facts:

1. Brenda Humes first contacted Dr. Clinton in regard to an abortion. A therapeutic abortion was performed on January 23, 1985. Brenda Humes was not advised of possible physical and psychological problems associated with having an abortion. Dr. Clinton did not have Brenda Humes sign a written consent form prior to undergoing the abortion.

2. During the course of this procedure, Dr. Clinton used a disposable plastic cannula which was inserted into Brenda Humes' uterus to remove the fetus. This plastic instrument comes in a sterile package and is intended for use on a single patient. The only known method of properly sterilizing this type of device is a complicated gas pressure system. However, Dr. Clinton reuses these instruments repeatedly to save money. He rinses them off in the sink and soaks them in Zephiron, a strong soap solution which has not been used by the medical community for a number of years.

3. Plaintiffs filed this lawsuit on May 18, 1987.

4. Brenda Humes suffers from pelvic inflammatory disease, post-traumatic stress disorder, and post-abortion syndrome.

5. Plaintiffs' medical expert testified that within a reasonable medical certainty Brenda Humes' pelvic inflammatory disease was caused by the August 1986 pregnancy complicated by the presence of the IPCS and that the disease was not present prior to the August 1986 pregnancy. During oral arguments, however, plaintiffs' counsel indicated a secondary cause of the infection could be the reuse of the disposable instrument during the January 1985 abortion.

The district court ruled that any negligence action claiming emotional distress from the January 23, 1985, abortion had to be brought within two years of the occurrence. The court concluded that no evidence was presented to indicate why the emotional distress was not ascertainable until a later date. Thus, the emotional distress claim was barred by the two-year statute of limitations, K.S.A. 60-513. K.S.A. 60-513(c) provides that a medical negligence claim shall be deemed to accrue at the time of the occurrence of the act giving rise to the cause of action, "unless the fact of injury is not reasonably ascertainable until some time after the initial act."

Brenda Humes contends she submitted to the January 1985 abortion without proper advice. Brenda asserts that, because Dr. Clinton failed to provide her with advice on the possible psychological consequences of obtaining an abortion, she could not reasonably ascertain any psychological injury until forced to consider a second abortion. She argues the cause of action did not accrue until she was faced with a life-threatening pregnancy that caused her to experience guilt and remorse over the previous abortion, feelings she could not have discovered until she was forced to elect to have a second abortion.

In *Cleveland v. Wong*, 237 Kan. 410, 701 P.2d 1301 (1985), a medical malpractice case, this court considered whether the plaintiff's claim was barred by K.S.A. 60-513. Before consenting to a surgical procedure to correct a urinary tract infection, the plaintiff in *Cleveland* was advised that temporary incontinence and sexual impotency were normal after the operation. 237 Kan. at 411. Following the operation, the plaintiff experienced incontinency and impotency for many months and was ultimately advised that his condition was permanent due to the physician's negligence in the urinary tract procedure. 237 Kan. at 412. Although the symptoms of the injury were known to the plaintiff immediately following the initial surgery, we found the injury was not reasonably ascertainable until diagnosed as permanent. 237 Kan. at 414. Thus, the cause of action did not accrue at the initial surgery, but at the point when plaintiff learned the injury was permanent.

The present case, however, is distinguishable. It does not involve a known temporary condition which was later identified as a negligently inflicted permanent injury. Brenda Humes does not claim she suffered mental anguish following the initial abortion which developed into a more serious psychological problem. In fact, Brenda does not claim she suffered any injury following the January 1985 abortion.

We also note, however, that Dr. Clinton's failure to warn Brenda about possible physical and psychological consequences of obtaining an abortion did not result in any physical injury. This court has long held there can be no recovery for emotional distress caused by the negligence of another unless accompanied by or resulting in physical injury. *Bowman v. Doherty*, 235 Kan. 870, 874-75, 686 P.2d 112 (1984); *Hoard v. Shawnee Mission*

*Medical Center,* 233 Kan. 267, 274, 662 P.2d 1214 (1983); *Clemm v. Atchison, T. & S. F. Rly. Co.,* 126 Kan. 181, 184, 268 Pac. 103 (1928); *Whitsel v. Watts,* 98 Kan. 508, 509, 159 Pac. 401 (1916). Brenda contends the pelvic inflammatory disease from which she suffers was caused either by the presence of the IUD during pregnancy or the reuse of a disposable instrument during the January 23, 1985, abortion. She makes no claim for physical injury accompanying the alleged emotional injury caused by Dr. Clinton's failure to warn her about possible mental disturbances following an abortion. Thus, there is no fact of injury to be reasonably ascertained at a later date and the two-year statute of limitations controls. We find no error in the trial court's decision.

The final issue we consider is the adequacy of the product warning provided by ALZA, manufacturer of the IPCS.

The IPCS is approved by the FDA for use for a period of twelve months, with replacement recommended at that time. ALZA's physician information sheet and patient information sheet in use at the time of Brenda's request for insertion of an IUD provided notice that pregnancy can occur with use of the IUD and that the IUD is to be replaced after twelve months' use. Dr. Clinton, however, did not give the patient information sheet to Brenda Humes, but provided her with an information sheet prepared by himself. The physician information sheet prepared by ALZA provides: "Prior to insertion the physician, nurse, or other trained health professional *should* provide the patient with the Patient Information Leaflet." A federal regulation mandates that the physician *"must* provide the patient with the Patient Brochure" prior to insertion of an IUD. 21 C.F.R. § 310.502 (1989). Dr. Clinton testified he would have given Brenda Humes the patient brochure if he had known of this federal regulation.

The district court denied ALZA's motion for summary judgment on the basis that a genuine issue of material fact existed as to whether ALZA's physician information sheet was in substantial compliance with the federal regulation.

The Humes contend ALZA is strictly liable or, in the alternative, is negligent per se because its product warning was never received. ALZA argues it had no duty to deliver the product warning information directly to the patient. The issue of whether

a drug manufacturer has a duty to give direct product warnings to IUD consumers is one of first impression in this court.

The Restatement (Second) of Torts § 402A (1964) imposes strict liability on the manufacturer of a product which is sold in a defective condition and is unreasonably dangerous to the user. See *Lindquist v. Ayerst Laboratories, Inc.*, 227 Kan. 308, 319, 607 P.2d 1339 (1980). Comment *k* of § 402A provides an exception for products which are incapable of being made safe. These products, when properly prepared and accompanied by proper directions and warnings, are not considered defective or unreasonably dangerous.

Manufacturers of prescription drugs have a duty to warn of dangerous side effects and risks associated with use of such drugs. *Wooderson v. Ortho Pharmaceutical Corp.*, 235 Kan. 387, 409, 681 P.2d 1038, *cert. denied* 469 U.S. 965 (1984). See *Lindsay v. Ortho Pharmaceutical Corp.*, 637 F.2d 87, 91 (2d Cir. 1980); *Ortho Pharmaceutical v. Chapman*, 180 Ind. App. 33, 39, 388 N.E.2d 541 (1979); *McEwen v. Ortho Pharmaceutical*, 270 Or. 375, 385, 528 P.2d 522 (1974). In many jurisdictions, the manufacturer's duty to warn is satisfied when only the prescribing physician is informed of the inherent dangers associated with the drug's use since the patient cannot obtain the drug except through a physician. *Timm v. Upjohn Co.*, 624 F.2d 536, 538 (5th Cir. 1980), *cert. denied* 449 U.S. 1112 (1981); *Hoffman v. Sterling Drug, Inc.*, 485 F.2d 132 (3d Cir. 1973); *McCue v. Norwich Pharmacal Company*, 453 F.2d 1033 (1st Cir. 1972). *Cf. Davis v. Wyeth Laboratories, Inc.*, 399 F.2d 121, 129-30 (9th Cir. 1968). This rule is based upon the theory that the physician acts as a learned intermediary between the drug manufacturer and the patient. Since prescription drugs are available only to a physician, it is the physician's duty to inform himself or herself of the characteristics of the drugs prescribed and to exercise his or her judgment of which drug to administer in light of the drug's propensities and the patient's susceptibilities. *Reyes v. Wyeth Laboratories*, 498 F.2d 1264, 1276, *cert. denied* 419 U.S. 1096 (5th Cir. 1974); *Terhune v. A. H. Robins Co.*, 90 Wash. 2d 9, 14, 577 P.2d 975 (1978). The learned intermediary rule allows a drug manufacturer to assume a patient places reliance on the physician's judgment and relieves the manufacturer of a duty to assist

the physician in communicating with patients. *Polley v. Ciba-Geigy Corp.*, 658 F. Supp. 420 (D. Alaska 1987).

A minority of cases have declined to follow the learned intermediary rule in products liability actions involving oral contraceptives or IUD's. *Hill v. Searle Laboratories*, 884 F.2d 1064, 1070-71 (8th Cir. 1989); *Odgers v. Ortho Pharmaceutical Corp.*, 609 F. Supp. 867, 878 (E.D. Mich. 1985); *Stephens v. G. D. Searle & Co.*, 602 F. Supp. 379, 380-81 (E.D. Mich. 1985); *MacDonald v. Ortho Pharmaceutical Corp.*, 394 Mass. 131, 475 N.E.2d 65, *cert. denied* 474 U.S. 920 (1985). These cases hold contraceptive drugs apart from other prescription drugs for several reasons. First, each case finds that the patient does not rely on the physician's judgment, but decides for herself whether to use some form of birth control. Second, these cases find it relevant that little contact or communication occurs between the physician and patient after the initial treatment. Finally, the cases impose a duty on the manufacturer to warn the patient directly because of marketing practices utilized by the manufacturer.

The majority of cases, however, have adopted the learned intermediary rule to relieve manufacturers of a duty to directly warn users of oral contraceptives or IUD's. *Brochu v. Ortho Pharmaceutical Corp.*, 642 F.2d 652 (1st Cir. 1981); *Lindsay v. Ortho Pharmaceutical Corp.*, 637 F.2d 87; *Skill v. Martinez*, 91 F.R.D. 498 (D.N.J. 1981), *aff'd* 677 F.2d 368 (3d Cir. 1982); *Goodson v. Searle Laboratories*, 471 F. Supp. 546 (D. Conn. 1978); *Dunkin v. Syntex Laboratories, Inc.*, 443 F. Supp. 121 (W.D. Tenn. 1977); *Chambers v. G.D. Searle & Co.*, 441 F. Supp. 377 (D. Md. 1975), *aff'd* 567 F.2d 269 (4th Cir. 1977); *Hamilton v. Hardy*, 37 Colo. App. 375, 549 P.2d 1099 (1976); *Mahr v. G. D. Searle & Co.*, 72 Ill. App. 3d 540, 390 N.E.2d 1214 (1979); *Ortho Pharmaceutical v. Chapman*, 180 Ind. App. 33; *Leibowitz et ux. v. Ortho Pharm. Corp.*, 224 Pa. Super. 418, 307 A.2d 449 (1973); *McEwen v. Ortho Pharmaceutical*, 270 Or. 375. These cases generally hold that even in the matter of oral contraceptives and IUD's, which are available by prescription only, the physician exercises his or her medical judgment in balancing the benefits and risks and makes the ultimate decision on which method, if any, should be used by the patient. *Allen v. G. D. Searle & Co.*, 708 F. Supp. 1142, 1147 (D. Or. 1989);

*Spychala v. G.D. Searle & Co.*, 705 F. Supp. 1024, 1032 (D.N.J. 1988).

In the present case, the Humes contend the learned intermediary rule has not been adopted in Kansas for IUD cases. We disagree. In *Tetuan v. A. H. Robins Co.*, 241 Kan. 441, 738 P.2d 1210 (1987), we considered a personal injury case involving an IUD known as the "Dalkon Shield." We recognized IUD's are available only through licensed medical care providers and held that manufacturers have a duty to warn the medical profession of dangerous side effects of their products. 241 Kan. at 463. We explicitly adopted the rationale for such a rule as stated in *Terhune v. A. H. Robins Co.*, 90 Wash. 2d at 14-15. The *Terhune* court stated:

"The reasons for this rule should be obvious. Where a product is available only on prescription or through the services of a physician, the physician acts as a 'learned intermediary' between the manufacturer or seller and the patient. It is his duty to inform himself of the qualities and characteristics of those products which he prescribes for or administers to or uses on his patients, and to exercise an independent judgment, taking into account his knowledge of the patient as well as the product. The patient is expected to and, it can be presumed, does place primary reliance upon that judgment. The physician decides what facts should be told to the patient. Thus, if the product is properly labeled and carries the necessary instructions and warnings to fully apprise the physician of the proper procedures for use and the dangers involved, the manufacturer may reasonably assume that the physician will exercise the informed judgment thereby gained in conjunction with his own independent learning, in the best interest of the patient. It has also been suggested that the rule is made necessary by the fact that it is ordinarily difficult for the manufacturer to communicate directly with the consumer.

"While recognizing the efficacy of this rule as applied to prescription drugs, the plaintiffs question its applicability to devices such as the Dalkon Shield. In advising upon the selection of a contraceptive, they say, the physician is not attempting to cure a malady and does not 'rely upon his many years of education and experience' to select an appropriate medication. We do not see this as a significant distinction. The physician does not confine his practice to the curing of maladies. He is concerned with the total health and physical well-being of his patients and appropriately gives advice upon preventive measures. Certainly the insertion of the Dalkon Shield requires a physician's services, his knowledge and his skill. While the physician does not make the final choice but leaves that to the patient, he advises the patient with respect to the advantages and disadvantages of various choices, as was done in this case, and it is he who supplies and inserts the device.

"The fact that the patient makes the final choice among suggested contraceptives (or decides not to use any at all) does not constitute a distinction which makes the general rule inapplicable. We can readily conceive of situations in which a physician gives the patient a choice of courses to follow. There is, for example, a patient's choice between continuing to endure a physical ailment or submitting to surgery or some other course of treatment; an obese person's choice among diets suggested by the doctor; and a surgery patient's choice of anesthesia where, in the doctor's opinion, a choice is permissible.

"In any such situation which may come to mind, the patient is expected to look to the physician for guidance and not to the manufacturer of the products which he may use or prescribe in the course of treatment."

Thus, it is clear we have adopted the learned intermediary rule, which relieves the manufacturers of the duty to warn consumers directly, in IUD cases.

The Humes next contend we indicated in *Wooderson v. Ortho Pharmaceutical Corp.*, 235 Kan. 387, a willingness to follow the holding of *Lukaszewicz v. Ortho Pharmaceutical Corp.*, 510 F. Supp. 961 (E.D. Wis. 1981). In *Wooderson,* we considered the issue of *when* a drug manufacturer's duty to warn arises and concluded that a manufacturer of oral contraceptives has a duty to warn the prescribing physician of dangerous side effects when a risk is known or should have been known. 235 Kan. at 409. In arriving at this decision, the court reviewed Scott, *Products Liability,* 1982 N.Y.U. Ann. Surv. Am. L. 709, 720-24, in which the author concluded, *inter alia,* that *Lukaszewicz* was correctly decided. 235 Kan. at 406-08. Let us examine the *Lukaszewicz* opinion.

In *Lukaszewicz,* a user of oral contraceptives brought a products liability action against the drug manufacturer alleging the manufacturer had a duty to warn her directly of possible side effects. 510 F. Supp. at 962. The court determined that Wisconsin had adopted the theory of negligence per se in that violation of a state or federal statute or administrative regulation constituted negligence per se where the statute or regulation was designed to protect a class of persons from a particular kind of harm. 510 F. Supp. at 964. The court examined 21 C.F.R. § 310.501 (1989), a federal regulation governing oral contraceptives, and determined the reason for requiring patient labels was to make patients more sensitive to possible side effects of the drug. 510 F. Supp.

at 965 (citing *Pharmaceutical Mfrs. v. Food & Drug Admin.*, 484 F. Supp. 1179 [D. Del. 1980]). Therefore, since 21 C.F.R. § 310.501 was enacted to protect persons like the plaintiff by warning them of possible side effects, the manufacturer's failure to warn plaintiff constituted negligence per se. 510 F. Supp. at 965.

ALZA contends *Lukaszewicz* is not support for imposing a duty to directly warn patients in IUD cases. First, ALZA asserts the federal regulations do not require the manufacturer of IUD's to provide direct warning to patients as in oral contraceptive cases. 42 Fed. Reg. 23,775 (1977) provides:

"The primary purposes of IUD labeling are to provide physicians and patients with adequate information so that patients can make an informed choice whether to use an IUD, and so that IUD's can be used in a safe and effective manner. The final regulation accomplishes this by requiring detailed information about IUD's to accompany every IUD, and also by requiring physicians to give patients time to read IUD information so they can make a more informed judgment about IUD use."

Additionally, 21 C.F.R. § 310.502 (1989) provides the following precaution:

"1. *Patient counseling.* Prior to insertion the physician, nurse, or other trained health professional must provide the patient with the Patient Brochure. The patient should be given the opportunity to read the brochure and discuss fully any questions she may have concerning the IUD as well as other methods of contraception."

21 C.F.R. § 310.502(b)(2) also states:

"Labeling, in sufficient quantities to be available to patients who express interest in IUD's, shall accompany each drug IUD (packaged separately from the sterile packaging), be made available to the patient, and contain the following information . . . ."

Comparatively, 21 C.F.R. § 310.501 states:

"(a) *Oral Contraceptives.* (1) The Commissioner of Food and Drugs concludes that the safe and effective use of oral contraceptive drug products requires that patients be fully informed of the benefits and risks involved in the use of these drugs. Information in lay language concerning effectiveness, contraindication, warnings, precautions, and adverse reactions shall be furnished to each patient receiving oral contraceptives. This information shall be given to the patient by the dispenser in the form of a brief summary of certain essential information included in each package dispensed to each patient . . . ."

A comparison of the oral contraceptive regulations and IUD regulations reveals a similar purpose, to inform patients of the benefits and risks involved in the drug's usage. The regulations achieve this goal by requiring the manufacturer of oral contraceptives and IUD's to include such information in each package of oral contraceptives and IUD's and by requiring the IUD manufacturer to supply the physician with sufficient amounts of patient information sheets to dispense to interested patients.

In *Spychala v. C. D. Searle & Co.*, 705 F. Supp. 1024, plaintiff's physician provided plaintiff with the defendant's patient brochure, but plaintiff alleged the drug manufacturer failed to adequately warn her of the risks associated with its Copper-7 (Cu-7) IUD. 705 F. Supp. at 1026-27. Defendant drug manufacturer argued it had no duty to warn plaintiff directly of the risks associated with its Cu-7 IUD. 705 F. Supp. at 1031.

The *Spychala* court ruled that the 21 C.F.R. § 310.502 mandate to manufacturers to supply physicians with uniform labeling with each IUD in order to aid the physician in communicating with his or her patient did not establish a voluntary duty on manufacturers to warn the patient directly. 705 F. Supp. at 1033 (citing *Polley v. Ciba-Geigy Corp.*, 658 F. Supp. at 421). Thus, since the defendant did not violate federal regulations and did provide adequate warning to the physician, under the learned intermediary rule the defendant had satisfied its duty by warning the physician but not the patient. 705 F. Supp. at 1033. A similar ruling was expressed in *Allen v. G. D. Searle & Co.*, 708 F. Supp. 1142.

After a careful examination of the above cases, we adopt the ruling of *Spychala* and other similar cases. The majority viewpoint is that under the learned intermediary rule drug manufacturers are not liable for failure to directly warn patients of risks and side effects. We adopted the learned intermediary rule in *Tetuan v. A. H. Robins Co.*, 241 Kan. at 463-64. *Lukaszewicz v. Ortho Pharmaceutical Corp.*, 510 F. Supp. 961, upon which the Humes rely for support, is a minority view. ALZA provided Dr. Clinton with physician and patient information sheets, thereby satisfying its duty to warn mandated by federal regulations. Thus, under the learned intermediary rule, ALZA is not liable for failure to

warn Brenda Humes directly of risks associated with use of its IUD.

This leaves unresolved only the question of whether ALZA's physician information sheet adequately informed Dr. Clinton. The test to determine adequacy of a warning is whether the warning is "reasonable under the circumstances." *Wooderson v. Ortho Pharmaceutical Corp.*, 235 Kan. 387, 404, 681 P.2d 1038, *cert. denied* 469 U.S. 965 (1984).

ALZA's physician information sheet directed that the physician "should" provide the patient with the patient brochure. 21 C.F.R. § 310.502 states that the physician "must" provide the patient with the patient brochure.

In *Graham v. Wyeth Laboratories,* 666 F. Supp. 1483 (D. Kan. 1987), the district court recognized that the adequacy of a warning was an issue for the jury and that the testimony of experts should be considered. 666 F. Supp. at 1499. In the present case, however, the Humes' medical expert testified that ALZA's physician warning concerning risk of pregnancy was adequate. Finally, we consider Dr. Clinton's testimony that the physician brochure adequately informed him of the complications and risks of pregnancy associated with IPCS use, which he would have given to Brenda Humes had he known of the regulation.

In light of the expert medical testimony provided by the Humes, no genuine issue of fact exists regarding the adequacy of ALZA's physician information sheet. We conclude, therefore, that the district court erred in denying ALZA's motion for summary judgment.

The judgment of the trial court denying summary judgment to Dr. Clinton and ALZA Corporation for wrongful death of a non-viable fetus is reversed.

The judgment granting summary judgment to Dr. Clinton for Brenda Humes' claim for damages from a previous abortion is affirmed.

The judgment denying ALZA Corporation summary judgment for failure to warn Brenda Humes is reversed.