Eric J. WRIGHT, a disabled minor, By
and Through The TRUST COMPANY
OF KANSAS, Conservator of the Estate of Eric J. Wright, Plaintiff,

v.

ABBOTT LABORATORIES, Defendant.

No. 97–1333–JTM.

United States District Court,
D. Kansas.

Aug. 16, 1999.

Lynn R. Johnson, Shamberg, Johnson & Bergman, Overland Park, KS, Larry W. Wall, Larry Wall & Associates, Wichita, KS, for Trust Company of Kansas, The, Eric J. Wright.

Richard C. Hite, F. James Robinson, Jr., Kahrs, Nelson, Fanning, Hite & Kellogg, Wichita, KS, June K. Ghezzi, Tina M. Tabacchi, Jones, Day, Reavis & Pogue, Chicago, IL, for Abbott Laboratories Inc.

John H. Gibson, Boyer, Donaldson & Stewart, Wichita, KS, for HCA Health Services of Kansas, Inc.

## MEMORANDUM ORDER

MARTEN, District Judge.

■ In the present action, plaintiff Eric Wright, a minor appearing by and through his conservator, alleges personal injuries due to allegedly inadequate warnings by defendant Abbott Laboratories. Abbott has moved for summary judgment on several grounds. For the reasons stated herein, the defendant's motion will be granted.[1]

Summary judgment is proper where the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to any material fact, and that the moving party is entitled to judg-

---

1. Also before the court are the plaintiff's motion for leave to file a surreply and supplement. Surreplies are disfavored, and normally will be permitted only upon prior invitation by the court. The court has read the motions of the plaintiff and the attached supplementary materials, and finds that no justification for the filing of materials outside the normal course of briefing has been shown. Further, even if the surreply were to be considered, it would not alter the factual findings or conclusions of law discussed herein.

ment as a matter of law. Fed.R.Civ.P. 56(c). In considering a motion for summary judgment, the court must examine all evidence in a light most favorable to the opposing party. *McKenzie v. Mercy Hospital*, 854 F.2d 365, 367 (10th Cir.1988). The party moving for summary judgment must demonstrate its entitlement to summary judgment beyond a reasonable doubt. *Ellis v. El Paso Natural Gas Co.*, 754 F.2d 884, 885 (10th Cir.1985). The moving party need not disprove plaintiff's claim; it need only establish that the factual allegations have no legal significance. *Dayton Hudson Corp. v. Macerich Real Estate Co.*, 812 F.2d 1319, 1323 (10th Cir. 1987).

In resisting a motion for summary judgment, the opposing party may not rely upon mere allegations or denials contained in its pleadings or briefs. Rather, the nonmoving party must come forward with specific facts showing the presence of a genuine issue of material fact for trial and significant probative evidence supporting the allegation. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Once the moving party has carried its burden under Rule 56(c), the party opposing summary judgment must do more than simply show there is some metaphysical doubt as to the material facts. "In the language of the Rule, the nonmoving party must come forward with 'specific facts showing that there is a *genuine issue for trial.*' " *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (quoting Fed. R.Civ.P. 56(e)) (emphasis in *Matsushita* ). One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and the rule should be interpreted in a way that allows it to accomplish this purpose. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). To the extent that any of the parties' requested findings of fact have not been included herein, this represents a determination by the court that the requested facts are not relevant, based upon inadmissible evidence, or both.

***Findings of Fact***

1. The Incident ................................................................1188
2. Abbott's Product .............................................................1190
3. Wesley Hospital ..............................................................1191
4. The Floor Stocking Policy at Wesley..........................................1192
5. Wesley's Knowledge ...........................................................1194
6. The "Palmer" Letter .........................................................1195
7. Plaintiff's Alleged Double Recovery..........................................1198

## 1. The Incident

Eric Wright was born at Wesley Hospital in Wichita, Kansas on November 10, 1992 at 6:51 p.m. At birth, he had good color and respiratory effort, but shortly afterward went limp and required resuscitation. Because of his low blood sugar levels, Wright was started on intravenous fluids and transferred to the Neonatal Special Care Unit (NSCU) for blood pressuring monitoring, thermoregulation and continued I.V. fluids.

Wright arrived at the NSCU at 9:45 p.m. with low blood pressure after resuscitation. Prior to transfer, his treating physician, Dr. Barry Bloom, had given an order to monitor blood sugars every hour. Nurse Donna Benjamin put Wright on a machine that read his blood pressure automatically every fifteen minutes. Shortly after the third reading, Nurse Benjamin had Dr. Bloom paged due to the infant's low blood pressure reading.

At approximately 10:50 p.m., Nurse Rhonda Martin took the following telephone order from Dr. Bloom for Eric Wright: "Piggyback normal saline, 20 ccs over 30 minutes." (Benjamin Dep. April 11, 1994, at 29–30). Dr. Bloom prescribed normal saline (0.9% sodium chloride) to

raise the infant's blood pressure levels. Eric Wright was not hyponatremic (that is, suffering from low sodium condition) at the time and did not have an electrolyte imbalance.

Nurse Karen Diltz overheard Nurse Martin repeating Dr. Bloom's order, and asked if she could help. Nurse Martin said, "Yes, if you could draw it up." (Diltz Dep. May 23, 1994, at 196).

Wesley's Department of Nursing "Medication Administration Policy" provided in pertinent part:

> the registered nurse and/or licensed practical nurse is legally accountable to know the medications, the action, adverse reactions and implications of nursing care for each medication administered.

(Hurst Dep. Exh. 26). The policy required the following checks prior to administering any medication:

> The name of the patient (if able, a patient should be asked to verbally state their name), the patient's identification band and speciality bands (if applicable), drug, dosage, route and time on the medication label three times.

(Id.)

Both in nursing school and again at Wesley, nurses were taught to check and double-check the "five Rs"—whether they have the right patient, the right drug, the correct route of administration, the right dose, and the correct time for administration. Plaintiffs nursing expert, Emily Jansen, R.N., testified that when a nurse administers a drug, the nurse must follow the "five Rs." According to Jansen, learning the "five Rs" is one of "the basics" in nursing school and in hospital practice.

Nurse Diltz did not read Dr. Bloom's order. Relying on what she had overheard, Diltz believed Dr. Bloom wanted normal saline to be given. In her deposi-

tion, she admitted her action was a departure from hospital policy.

At approximately 11:00 p.m., Nurse Diltz removed a vial from the medication cart in the work room of the NSCU. The medicine cart contained, in drawers on different levels, 0.9% sodium chloride and 14.6% sodium chloride. Although it was Nurse Diltz's practice to read a drug label three times before administering a drug, she did not read the label on the vial to determine the concentration of sodium chloride she had retrieved.

She knew at the time that normal saline solution and 14.6% sodium chloride were stocked in the same medication cart, but in different drawers. The drawer of the medication cart containing 14.6% sodium chloride had a label identifying its contents.[2]

Nurse Diltz knew before she took the vial from the cart that Eric Wright was not hyponatremic, and that none of the indications for using concentrated sodium chloride was present. She also knew the difference between "normal saline" and 14.6% sodium chloride. She knew that normal saline (0.9% sodium chloride) was used as a volume expander for hypotensive patients, whereas 14.6% sodium chloride was used to replace electrolytes for hyponatremic patients. Before November 10, 1992, she had administered 14.6% sodium chloride more than ten but less than a hundred times. Nurse Diltz knew that a medication error involving 14.6% sodium chloride could result in serious injuries. She knew that if too much sodium was injected into a patient, sodium levels would increase, resulting in a possible imbalance of the fluid distribution in the body. She also knew that such condition could result in an "intraventricular bleed," causing permanent brain damage.

Nurse Diltz knew that the order left by Dr. Bloom was for normal saline "because you would never add ... 20 ccs of sodium

---

**2.** For purposes of the present summary judgment motion only, defendant Abbott Laboratories concedes Nurse Diltz selected, and

Nurse Benjamin injected, Abbott's saline product into Wright's I.V.

chloride to an I.V. solution, it would be too large an amount to add to an I.V." (Diltz Dep. May 23, 1994, at 246–47). Moreover, she knew that the order was for a "volume expander," and testified: "we do not give 14.6% sodium chloride as a volume expander." (Id., at 197).

Still, Nurse Diltz drew 25 ccs of 14.6% sodium chloride from the vial, and gave the syringe to Nurse Benjamin. Nurse Benjamin injected the sodium chloride into a porthole in Wright's I.V. tubing.

Less than an hour later, Dr. Bloom ordered another 20 ccs of normal saline. Again, Nurse Diltz went to the medicine cart, took a vial of 14.6% sodium chloride from the drawer, and drew 25 ccs with a syringe. She again handed the syringe to Nurse Benjamin, who, at around 11:50 p.m., injected the sodium chloride into Eric Wright's I.V. tubing.

Nurse Diltz testified that she knew the normal saline vial only held 10 ccs, and that when she went for the vial with the larger amount in it, she looked only "at a portion of the label and did not look at the percentage." (Id., at 284). She testified that in both instances she failed to follow nursing policies, failed to read the concentration on the vial, and handed the syringe to a nurse who was not authorized to administer the solution.

Nurse Diltz also testified that, as soon as she retrieved the empty vial from the trash, she knew "it was the wrong vial ... it was the vial that I used but I should not have used it ... because I knew it wasn't normal saline ... it was the wrong concentration." (Id., at 195–96). She knew it was wrong because "It's on the label." (Id. at 196). Diltz testified, "I made a mistake," and that her "thought process did not continue on where it should." (Id. at 197; Diltz Dep. July 13, 1994, at 472).

As a result of this injection of concentrated saline into the I.V. tubing, plaintiff Eric Wright has incurred substantial, severe, and permanent physical injuries.

## 2. Abbott's Product

Sodium chloride (NaCl) is a white crystalline compound freely soluble in water. When it is dissolved in water, it provides a positive sodium ion and a negative chloride ion, which are the normal constituents of the body's fluids and are essential for maintaining electrolyte balance. A deficiency of sodium in body serum is known as "hyponatremia." In neonates, hyponatremic dehydration results from relatively greater losses of sodium than water. On the other hand, too much sodium in the bloodstream is known as "hypernatremia."

Saline or "normal saline" is a water solution of sodium chloride which forms the basis for most of the body's fluids, and has the same concentration of sodium chloride as normal body fluids. Concentrated sodium chloride products are used in the treatment of hyponatremia to replace the sodium losses that have occurred.

Abbott's 14.6% sodium chloride product, as stated in the relevant package insert, is a concentrate, for use only after dilution with compatible intravenous fluids to correct sodium deficiency. On the first page of the package insert, Abbott warns at least eight times that the product is concentrated or that it must be diluted. The insert provides in bold print, among other things:

- CONCENTRATE
- CAUTION: MUST BE DILUTED FOR I.V. USE
- 14.6% SODIUM CHLORIDE Injection
- ADDITIVE SOLUTION
- CONCENTRATED SOLUTION
- FOR USE ONLY AFTER DILUTION WITH COMPATIBLE I.V. FLUIDS

(Def. Exh. 1, at 1).

The "WARNINGS" section of the package insert provides that the 14.6% solution is hypertonic and must be diluted prior to administration. Inadvertent direct injection or absorption of concentrated

sodium chloride solution may give rise to sudden hypernatremia and such complications as cardiovascular shock, central nervous system disorders, extensive hemolysis, cortical necrosis of the kidneys and severe local tissue necrosis (if administered extravascularly).

(Id. at 3).

The "PRECAUTIONS" section of the package insert provides that the product "must be diluted before infusion to avoid a sudden increase in the level of plasma sodium. Too rapid administration should be avoided." (Id. at 4). The "ADVERSE REACTIONS" section of the insert states: "Sodium overload can occur with intravenous infusion of excessive amounts of sodium-containing solutions." (Id.). The "DOSAGE AND ADMINISTRATION" section states that the product is "administered intravenously *only after addition to a larger volume of fluid*. The dose, dilution, and rate of injection are dependent upon the individual needs of each patient." (Id. at 5) (emphasis in original).

The package label contains the following legend:

**CONCENTRATE**

*CAUTION: MUST BE DILUTED FOR I.V. USE*

# 14.6%

# SODIUM CHLORIDE

(Def.Exh. 3). The first two lines are shown in a box, with the first line in white letters on a red background, the second in red letters on a white background. The "14.6%" is also shown in red on a white background.

Dr. Milley, plaintiff's expert, has testified that any health professional who read the first page of the package insert would know that 14.6% sodium chloride is not supposed to be directly injected into any person.

**3. Wesley Hospital**

Wesley Medical Center is a 760–bed tertiary care hospital located in Wichita, Kansas. As noted in *Reazin v. Blue Cross & Blue Shield of Kansas*, 663 F.Supp. 1360, 1371 (D.Kan.1987), *aff'd*, 899 F.2d 951 (10th Cir.1990), *cert. denied*, 497 U.S. 1005, 110 S.Ct. 3241, 111 L.Ed.2d 752 (1990), and as both parties agree, Wesley provides "sophisticated health care services to residents of Wichita, Sedgwick County, the State of Kansas, and out-of-state patients." It is a major teaching hospital, and provides clinical services, medical research, and outreach care programs. It was one of four incorporating hospitals which formed "Health Frontiers," a network of 30 mid-western hospitals seeking to provide joint purchasing power, expertise and office sharing, and economies of scale.

Throughout the relevant period, Wesley had three levels of neonatal units: (1) Receiving Nursery or "Well Baby" Nursery; (2) Neonatal Special Care Nursery or Neonatal Special Care Unit (NSCU); and (3) Neonatal Intensive Care Unit (NICU). The NICU mainly treated children needing alternative feeding approaches, mechanical ventilation, children with cardiovascular instability, and children recovering from surgery. The NSCU cared for newborn infants "between,(sic) well baby status and newborn intensive care." (Bloom Dep. at 8.) NICU and NSCU are in the same building, but on different floors of the hospital.

At all relevant times, Michael Hurst was the Director of Pharmacy Services at Wesley, a position he has held since 1987 and still holds. Hurst obtained a degree in

pharmacy from the University of Kansas in 1966, and an MBA from Wichita State University in 1978. He joined Wesley as a Staff Pharmacist in 1966, and was later promoted to Senior Staff Pharmacist and then the Assistant Director of Pharmacy Services. Hurst has memberships in the American Society of Hospital Pharmacists and the Wichita Academy of Pharmacists.

As the Director of Pharmacy Services, Hurst reports to the Vice President, Administration for Professional Services, and is responsible for the complete operation of the Pharmacy Department, including proper policies and procedures.

Ella Hamilton obtained a pharmacy degree from the University of Kansas School of Pharmacy in 1974. Shortly after graduation she worked for Wesley for approximately seven months. In 1979, she returned to Wesley and has been a staff pharmacist ever since. Hamilton was responsible for and performed monthly inspections of the drug storage areas on the NSCU.

Barry Bloom is a medical doctor specializing in neonatology, who has practiced at Wesley since 1986. In 1992, Dr. Bloom was the Medical Director of the NICU and NSCU, and was Eric Wright's treating physician. Dr. Bloom is currently Medical Director of Wesley's NICU.

Delaine Bartsch is a registered nurse who graduated from the Medical University of South Carolina in 1982. She began working in the NSCU at Wesley in 1988. In October 1991, she became the Department Director of Special Care Nurseries and held that position when Wright was admitted to the NSCU.

Karen Diltz is a registered nurse who obtained her degree from William Jewell College in 1985. She began work in the NSCU at Wesley in 1987 and has worked in that unit, as well as in NICU, until today.

Donna Benjamin is a licensed practical nurse who was employed by Wesley during the relevant time period. She received her diploma from nursing school in 1981, and in November 1991 Wesley sent her to a ten-week class for I.V. administration.

Cynthia Harmon is a registered nurse who has been employed by Wesley since 1974. She has been the Nurse Manager of Wesley's NICU since 1978, and is in charge of the other nurses working in the NICU.

### 4. The Floor Stocking Policy at Wesley

Wesley's Pharmacy Department was responsible for providing continuing pharmaceutical services to the hospital. Wesley had a central pharmacy that was staffed 24 hours a day, and two satellite pharmacies. One satellite pharmacy was located in the surgery area and labor delivery area; the second was near the NICU. The satellite pharmacies were staffed for the first and second shifts during the week and only the first shift on weekends.

The Pharmacy Department had the responsibility "to distribute drugs to the patient care areas in an efficient manner which will assure their availability when needed for administration and assure their safe use." (Hurst Dep. Ex. 10, at § D–5). Wesley pharmacists were "expected to keep up with the professional literature and maintain a working knowledge of current trends in therapeutics." (Id.) The Pharmacy Drug Information Center, within the Pharmacy Department, maintained a reference library containing textbooks, journals, commercially published drug information and reference files categorizing information alphabetically by generic name, disease date, or special topic heading (such as sodium content, teratogenic agents).

The Pharmacy and Therapeutics Committee ("P & T Committee") of the Wesley Medical Staff developed or approved policies and procedures relating to the selection, distribution, handling, use, and administration of drugs and diagnostic testing materials, among other functions. The P & T Committee includes one phy-

sician member from each of the following areas of speciality: infectious disease, cardiovascular disease, pediatric allergy, anesthesiology, family practice, oncology, pulmonary disease, obstetrics/gynecology, orthopedic, otolaryngology, urology, and pediatric/neonatology. Each physician member of the committee had one vote. Also participating on the committee, without a vote, were two members of Nursing Services, Quality Assurance Director, Director of Pharmacy Services, Clinic Coordinator, Drug Utilization Evaluation Coordinator, Administration, Pharmacy Supervisor, and a recording secretary.

All pharmacy policy implementation and change requests were submitted to the P & T Committee by the Director of Pharmacy Services. In addition, all Pharmacy Department policies were reviewed annually by the P & T Committee for the "purpose of establishing their consistency with current practices within the Hospital." (Hurst Dep. Ex. 10, at § F–7–1).

Because drug storage areas throughout Wesley were under the supervision of the Director of Pharmacy Services, the Director of Pharmacy Services or one of his pharmacists/designees was responsible for monthly inspections of all nursing units or other areas of Wesley where medications were dispensed, administered or stored.

During Michael Hurst's more than thirty years at Wesley, there has been a continuous quality improvement program. It is uncontroverted that the subject of medication errors has been of great concern at Wesley. As a result, Wesley had a Pharmacy Quality Assessment Program to undertake a continuous analysis of medication dispensing errors. The Director of Pharmacy Services prepared monthly reports for the P & T Committee of medication dispensing errors. Wesley policy provided, "critical errors will be evaluated immediately and the Chairperson of the Pharmacy and Therapeutics Committee will be contacted to determine if policy changes are required to reduce serious errors in the future." (Hurst Dep. Ex. 10,

at § J–20). In an effort to minimize the risks associated with the use of drugs, the P & T Committee also developed a list of restricted drugs and guidelines for use of those drugs.

In the early 1980's, Wesley developed an I.V. admixture pharmacy to minimize I.V. preparation, storage and handling outside of the pharmacy. With respect to orders for additions to I.V. solutions, the Pharmacy Department's I.V. Admixture Guidelines provided:

> The pharmacy will not make additions to IV solutions once they have been started. If the physician deems it necessary to add medication to a solution which is already being infused, the addition is to be made by the nurse on the unit. The medication to be added may be obtained from the emergency supply on the unit or from the IV Admixture Pharmacy if not available in emergency stock.

(Id., at § M–6–2).

"Floor stock" at Wesley means those "items that nursing has immediate access to for patient use." (Hurst Dep. Ex. 4.) Floor stock requests, either additions to or deletions from, were within the purview of the P & T Committee.

It is uncontroverted that, when reviewing a floor stock request, the P & T Committee would assess the additional risk of medication errors against the need for nursing to have access to the proposed floor stock item for patient use. Ultimately, however, it was the practice of the P & T Committee "to defer to the judgment of the medical director of the affected nursing area whether there was a medical need to floor stock the medication." (Hartman Affidavit, ¶ 11).

In November 1992, concentrated sodium chloride was a floor stock item in critical care areas for electrolyte therapy. Before that time, Hurst knew that concentrated sodium chloride could cause serious injury if administered improperly, or if the nurse selected the wrong concentration. He knew that 14.6% sodium chloride should

never be injected without dilution. According to Dr. Keck Hartman, who chaired Wesley's P & T Committee in 1991 and 1992, the committee also appreciated these risks.[3] It knew that injection of concentrated sodium chloride could cause serious injury.

Before 1992, a patient at Wesley had been injured when he received excessive quantities of 3% sodium chloride through an I.V. bag. That incident prompted Wesley to adopt restrictions for sodium chloride concentrations greater than 3%. Beginning in September of 1991 "I.V. sodium chloride (3% or greater)" was listed as a "restricted drug" and there were published guidelines for its use. (Hurst Dep. Ex. 10, at § 3–25). This policy was created due to the danger of "hypernatremia, impairment of renal function, fluid, solulate overload, tachycardia, seizure and coma." (Hurst Dep. July 1, 1994, at 158).

In 1992, the NSCU was an approved floor stock nursing area. The P & T Committee approved the floor stock of concentrated sodium chloride on the NSCU because of the medical staff's perceived need to have it immediately available if necessary. Dr. Bloom testified that there are times when a patient will need "immediate action" to correct an electrolyte disturbance. (Bloom Dep. Feb. 8, 1999, at 18).[4] P & T Committee chair Hartman concluded that, based upon the opinions of Dr. Bloom and Dr. Curtis Dorn, the neonatologist member of the committee, there was a medical need for nursing to have immediate access to concentrated sodium chloride on the unit for patient use. This decision to floor stock concentrated sodium chloride on the NSCU took into account the potential additional risk created by dispensing the solution from floor stock on the one hand and the need for immediate access to those drugs on the other hand.

As Director of Pharmacy Services, it was Hurst's duty periodically to review the NSCU's medication floor stocking policy.

In November 1992, the NSCU stocked concentrated sodium chloride in an immobile medicine cart that was located in a supply room on the unit. The standard floor stock consisted of two vials of 14.6% sodium chloride and twenty-five vials of normal saline (0.9% sodium chloride).

5. **Wesley's Knowledge**

Wesley's Director of Pharmacy Services, Michael Hurst, has testified that, before the Eric Wright incident, he knew dispensing medications from floor stock could increase the risk of medication errors. He also knew that nurses could make mistakes when they are using sodium chloride. For instance, he knew that nurses could select the wrong concentration, draw up too much or too little of the right concentration, and not dilute it properly before administration. They could administer it in improper ways, by improper routes, and to the wrong patients.

He knew in 1992 and before that one approach to reducing risk of medication errors was to reduce floor stock items. It was standard hospital practice for the pharmacy to control the dispensing and administration of drugs in order to minimize error, and Hurst stated he has read literature on the subject. Hurst knew that there were reasons for minimizing or attempting to eliminate floor stocking of drugs which invoked risks if improperly administered.

Hurst has stated that he probably read the package insert for 14.6% sodium chlo-

---

**3.** Wesley's Hospital Notification System form, to be completed within 24 hours of any incident, has a box to be checked when a patient has been injected with "Wrong Solution/Med." (Def.App.Exh. 10). Nurse Natalie Reynolds checked this box in her report of the Eric Wright incident.

**4.** Bloom testified that in 1992, the pharmacy had "a turn around time from order to delivery of about four to five hours," and that if a medication was required in less than four hours, it needed to be kept on hand in the relevant unit. (Bloom Dep., at 47–48).

ride at or about the time of the label revision in August 1991. It is uncontroverted (see Def. Fact ¶ 69, second sentence), that Hurst knew in 1992 and before that there was a risk of serious adverse reaction if an excessive dose of concentrated sodium chloride was administered to a newborn by I.V., and if a doctor had prescribed normal saline but 14.6% was inadvertently administered instead.

To obtain information about a particular drug product, Hurst testified the Pharmacy Department personnel "would go to the package insert[s] themselves." (Hurst Dep. July 28, 1994, at 334–35). They could also go to resources such as the American Hospital Formulary and the Micromedex drug information program.

Wright's treating neonatologist and head of the NSCU, Dr. Bloom, has testified:

> I didn't have to have the FDA tell me that there's a risk of [inadvertent administration of concentrated sodium chloride] . . . if you asked me when I was a second year medical student if administering 14 percent sodium chloride solution would harm someone, I would say absolutely. Direct intravascular administration is harmful.

(Bloom Dep. Feb. 8, 1999, at 69). Bloom further testified that he knew that medication errors

> could occur almost anywhere. If it could occur at the bedside, it could occur in the drug room, it could occur in the pharmacy, it could occur anywhere. So where they restricted this to or where they put it, I don't know that we could prevent the kind of error that occurred in this situation.

(Id., at 36).

Nurse Diltz testified that she knew, in 1992 and before, that a medication error involving 14.6% sodium chloride could result in serious injuries, including an intraventricular bleed causing permanent brain damage. Nurse Harmon testified that every nurse's training includes procedures for mixing and calculating dilutions for electrolytes, including concentrated sodium chloride, and the importance of avoiding medication errors. That nurses should read medication labels is "more or less drummed into nurses and nursing students." (Harmon Dep. at 30).

Ella Hamilton, Wesley's Staff Pharmacist, testified that she was aware of a risk of inadvertent administration of concentrated sodium chloride created by the floor stocking of concentrated sodium vials in proximity to vials of normal saline.

Plaintiff's expert, Dr. Milley, acknowledged that he had learned of the dangers of rapid infusion of concentrated sodium chloride as a medical intern or resident and agreed that a resident in the NICU or NSCU should also be aware of those dangers. Another plaintiff's expert, Dr. Fassett, agreed that, in 1992 and before, pharmacists knew or should have known that inadvertent administration of highly concentrated sodium chloride in lieu of normal saline might cause very serious effects. Dr. Fassett also testified that the risks of injecting sodium chloride instead of normal saline include necrosis, effects on the central nervous system, brain damage, coma and death, and are learned in pharmacy school. In his opinion, pharmacists in 1992 and earlier should have known of such risks.

Defendant's expert, Nurse Edwards, testified that she learned during nursing orientation at St. Francis Hospital in 1982 that

> there's a difference between the normal saline and the concentrated sodium chloride; that the concentrated sodium chloride must be diluted before given to a patient IV; that there are certain dangers involved in giving that in lieu of normal saline [including] everything from just clinical symptoms of hyponatremia, which is a high sodium level, up to seizures and even death as a result.

(Edwards Dep. at 15–16)

### 6. The "Palmer" Letter

In August 1991, Abbott learned for the first time that in April of 1990 the FDA

had written to certain manufacturers of 23.4% concentrated sodium chloride requesting a label change to their products. This request occurred in the "Palmer" letter, which was apparently drafted by FDA and Lyphomed (now Fujisawa/Lyphomed), and came on the heels of several incidents involving the misadministration of Lyphomed's 23.4% concentrated sodium chloride product in 1989.

There is no evidence that the FDA sent such a letter to Abbott. Nor is there any evidence that the FDA sent such a letter to manufacturers of concentrated sodium chloride other than three makers of the 23.4% solution.[5] In April 1990, Abbott did not even manufacture or market vials of 23.4% sodium chloride.

The Palmer letter, dated April 10, 1990, recommended that a statement be added to the labeling, warning that inadvertent direct injection of concentrated sodium chloride may give rise to hypernatremia and produce very serious medical results. The letter also asked the manufacturers to send an Important Drug Warning letter to hospital customers suggesting that one precaution they might take to reduce medication error would be to restrict the dilution of such solutions to the hospital pharmacy.

The Palmer letter did not distinguish between large and small hospitals, between hospitals with critical care units and those that had none, or between those with full-time pharmacies and those without them. Nor did the FDA letter address the needs of the medical staff or patients at any particular hospital. Moreover, the Palmer letter did not require hospitals to eliminate concentrated sodium chloride from floor stock.

Abbott has provided evidence that it never received such a letter from the FDA. In fact, Abbott did not even see a copy of the letter until nearly 18 months after it was first issued. When Abbott did obtain a copy of the letter—through a third party—Abbott's Director of Regulatory Affairs for its Hospital Products Division instigated an immediate label change that adopted in full the warning proposed in the April 1990 letter. When Abbott submitted its proposed label change, it specifically informed the FDA that Abbott had never received a copy of the April 10, 1990 letter, and attached a copy that it had just been given. The FDA corresponded with Abbott concerning its proposed label change, approved Abbott's labeling, and requested some additional minor changes to the shipping carton in which the individual units were boxed and shipped. From the time that the FDA corresponded with Abbott regarding this label change, the FDA did not request that Abbott send the Palmer letter, or any letter, to its customers. Nor did the FDA ever suggest, in any way, to Abbott that its customers needed to receive such a letter containing information that was some 18 months old. Abbott began shipping product with its revised August 1991 labeling by September 21, 1991.

Hurst, Wesley's Pharmacy Director, has testified that the Palmer letter "did not

---

5. Plaintiff contends that the Palmer letter was directed to all "manufacturers of sodium chloride." Plaintiff provides no evidence to support this contention. The Palmer letter itself is addressed only to "Gentlemen," and the only documented, direct recipients of the letter were manufacturers of 23.4% sodium chloride, a product which Abbott did not manufacture at the time of the Palmer letter. Plaintiff has not conducted discovery of FDA personnel in the present action. Plaintiff has produced no evidence which would controvert the direct evidence of Abbott that (1) it never received the Palmer letter directly from the FDA, (2) it only received a copy of the letter indirectly through a third party almost a year and half after it was issued, (3) in response to the letter it immediately contacted the FDA with a proposed label change, and (4) in response the FDA never suggested Abbott send an Important Drug Warning concerning its 14.6% sodium chloride product to its hospital or other customers. Former FDA Commissioner Arthur Hayes has stated that "if FDA expected Abbott to send the [Important Drug Warning] letter, my experience with the FDA is that it would have told them to do so." (Hayes Dep. at 12–13).

have any effect on [his] decision to remove floor stock" from certain areas of the hospital, and that throughout 1994, Wesley was engaged in a thorough transition of its drug distribution system.[6] Hurst's undisputed testimony is that if he had received a letter like the Palmer letter, when it was issued, he "would share this information with [his] relevant staff inside the pharmacy and then also work directly with [his] chairman of pharmacy and therapeutics committee on making a determination on what actually would be required for patient safety." (Hurst Dep. Sept. 29, 1998, at 40–41). Hurst also testified that if he had received such a letter from a manufacturer, he may have "determined that no action is necessary at that point." (Hurst Dep. July 28, 1994, at 331). He would review it and "determine what action we should take specifically," but that he would not have to follow recommendations from manufacturers or the FDA because he would exercise his own independent judgment about them and "would not feel obligated to immediately react." (Id., at 339–340). Hurst testified that, in some instances, recommendations from the FDA or manufacturers have not contained helpful information, and Wesley has not followed them.

Dr. Bloom has testified that the contents of the Palmer letter were "not new information" to him. (Bloom Dep. Feb. 8, 1999, at 69). Dr. Bloom also testified that the letter plaintiff claims Abbott should have

sent, was not "a very helpful letter" and that it did not "strike [him] as something [he] would react to or respond to in the daily course of business." (Id. at 28–29). Dr. Bloom testified that the process for I.V. fluid preparation in the central pharmacy had a turnaround time from order to delivery of about four to five hours. In some instances, a patient who has serious problems because of an electrolyte disturbance needs immediate action.

Plaintiff, citing the testimony of Dr. Bloom, contends only the NICU, not the NSCU, had a frequent need for immediate electrolyte modification—once or twice a year. But Dr. Bloom's testimony was unequivocal that he believed concentrated saline should be floor stocked for both NICU and NSCU, since pharmacy preparation took too long. Dr. Bloom testified that removing concentrated electrolytes from floor stock without having a substitute process that was at least as efficient was irrational in light of patient needs which might require doctors having immediate access to electrolytes to alter I.V. fluids. Dr. Bloom testified that, when a patient was suffering from an electrolyte imbalance, the imbalance must be corrected "as quickly as you can." (Bloom Dep. at 22). Moreover, in the summer of 1990, Wesley could not have restricted concentrated sodium chloride solutions to the pharmacy because it would not have been logistically possible to make the product available to patients in a timely manner due to lack of

---

6. In responding to the motion for summary judgment, plaintiff argues that in 1994 Wesley, "in response to the [Palmer] letter," altered its method of dispensing concentrated saline, citing the recorded statement of Mary Smith, Wesley's Risk Manager. (Def. Exh. 20, at 3–4; see Plf. Uncontr. Fact ¶¶ 125–26). The court sustains Abbott's multiple objections to the evidence cited by plaintiff, and the inference drawn from it. Smith's statement was recorded by stenographer, but it is unsworn. It was taken to memorialize settlement discussions in the litigation against Wesley. As used here offensively against Abbott, the statement is inadmissible hearsay.

Moreover, the statement by Ms. Smith is clearly not based on personal knowledge.

When she was deposed, Smith acknowledged she had not been a member of the P & T Committee at any time since 1986, and had not read their minutes. She explicitly testified that she did not know why the P & T Committee recommended a change of policy regarding sodium chloride: "I don't know. I mean, I don't know when they did that or how they did it, so I don't know." (Smith Dep. at 24). Asked specifically if any change of policy had occurred as a result of the Palmer letter, Smith stated "I have no idea." (Id. at 5).

As noted in the main text, the uncontroverted testimony of Hurst is that the Palmer letter played no role in his decision to alter the floor stocking arrangements in 1994.

adequate delivery or systems, lack of 24–hour I.V. admixture services, and the fact that the pharmacy servicing the NSCU was not open 24 hours a day. In fact, the automated delivery system did not become available until late 1993 or early 1994.

Even after 1994, when Wesley began using a central admixture center, electrolytes and other drugs had to remain on the units for the mixing of I.V.s by nurses. To this day, nurses in Wesley's NICU continue to handle vials of 14.6% sodium chloride, and to dilute the solution for electrolyte balancing in newborns.

### 7. Plaintiff's Alleged Double Recovery

On January 7, 1994, plaintiff filed a medical malpractice action in the District Court of Sedgwick County, Kansas, (Case No. 94 C 66), against HCA Wesley Medical Center and Dr. Barry Bloom, M.D. On February 10, 1994, the petition was amended to remove Dr. Bloom as a defendant. Plaintiff prayed for damages in the sum of $17,807,317.

On November 14, 1994, plaintiff entered into a Settlement Agreement and Release with Wesley. The Settlement Agreement provides for an initial lump-sum payment of $3,574,710.62 on November 14, 1994, and smaller lump-sum payments on four other occasions.[7] It also requires periodic payments over plaintiff's lifetime, beginning on December 15, 1994 with $5,588.12 per month, and escalating annually until they reach $81,217.04 per month on November 15, 2022, just after plaintiff reaches the age of 30.

The payments from December 1994 through November 2009 are guaranteed. Payments beginning in December 2009 and continuing for the remainder of plaintiff's life are contingent upon his survival.

Eric Wright is 6 years old. Plaintiff's experts project a life expectancy of an additional 57 to 67 years. Plaintiff is thus guaranteed to receive over $7 million (the initial lump-sum payment plus the payments certain through 2009). If plaintiff reaches the age predicted by his experts, he will receive between approximately $45 and $63 million. Plaintiff's damages expert based his opinion, in part, upon a third projected life expectancy of an additional 75.64 years.

Plaintiff's life care plan expert proposed three alternatives for plaintiff's day-to-day care under the two different life expectancy projections: 57 additional years and 67 additional years from November 1998 (or a total of 63 years and 73 years, respectively). Based on these life care plans, as well as a third projected life expectancy of an additional 75.64 years, or a total of 81.64 years, plaintiff's damages expert, Dr. Harold Goldstein, prepared three reports estimating plaintiff's loss of earning capabilities and the sums that plaintiff's conservator will need to cover plaintiff's future expenses. Dr. Goldstein opined that, if plaintiff reaches age 63, he will lose earning capacity of $2,113,220 and will incur expenses of between approximately $11.7 and $15.7 million. If he reaches age 73, he will lose earning capacity of $2,404,153 and incur expenses of between approximately $16.1 and $20.2 million. If he reaches age 81.64 years, he will lose earning capacity of $2,404,153 and incur expenses of between $20.6 and $24.6 million. Thus, the range of damages under Dr. Goldstein's theory is approximately $13.8 million to $27 million.

### *Conclusions of Law*

In the present action, defendant Abbott Laboratories seeks summary judgment on the following grounds: (1) It provided adequate warnings to Wesley, a learned intermediary; (2) Abbott had the right to assume Wesley's employees would follow warnings on the product; (3) the action is barred by K.S.A. 60–3301 since the product was administered by Wesley, a sophisticated user; (4) any absence of warning

---

**7.** $75,000 on November 15, 2014; $100,000 on November 15, 2019; $140,000 on November 15, 2024; and $203,932.58 on November 15, 2029.

was not the proximate cause of plaintiff's injuries; and (5) plaintiff has already been fully compensated by a settlement with Wesley. Plaintiff argues that summary judgment is inappropriate, since Abbott failed to provide any warning to Wesley of the particular form of risk here: that concentrated saline could be mistaken for diluted saline. Plaintiff argues that Abbott's product warning was inadequate, since it ignored the FDA "Palmer" letter, and failed to specifically notify its customers of the risk of mistaken injection of concentrated saline, and that such injections were a "foreseeable misuse" which Abbott's warnings did not foreclose.

With the exception of the last argument advanced by Abbott (the claim of double recovery), the court finds that summary judgment is appropriate on each of the grounds sought.[8] The plaintiff's argument that Abbott violated a duty by ignoring the FDA "Palmer" letter should be rejected. The warnings given by Abbott were adequate, the medical practitioners were aware of the risks of mistaken drug usage in general and the dangers of concentrated saline in particular, and any additional warning by Abbott would not have prevented the injury to the plaintiff.

■ Under Kansas law, manufacturers of ethical drugs have a duty to warn users "of any dangerous side effects produced by the drugs of which it knows, or has reason to know." *Wooderson v. Ortho Pharm. Corp.*, 235 Kan. 387, 681 P.2d 1038 (1984).

Manufacturers of prescription drugs have a duty to warn of dangerous side effects and risks associated with use of such drugs. In many jurisdictions, the manufacturer's duty to warn is satisfied when only the prescribing physician is informed of the inherent dangers associated with the drug's use since the patient cannot obtain the drug except through a physician. This rule is based upon the theory that the physician acts as a learned intermediary between the drug manufacturer and the patient. Since prescription drugs are available only to a physician, it is the physician's duty to inform himself or herself of the characteristics of the drugs prescribed and to exercise his or her judgment of which drug to administer in light of the drug's propensities and the patient's susceptibilities. The learned intermediary rule allows a drug manufacturer to assume a patient places reliance on the physician's judgment and relieves the manufacturer of a duty to assist the physician in communicating with patients.

*Humes v. Clinton*, 246 Kan. 590, 600–01, 792 P.2d 1032 (1990) (citations omitted). *See also Hall v. Merck, Sharp & Dohme*, 774 F.Supp. 604, 605–06 (D.Kan.1991).

In the present case, the facts surrounding the inadvertent injection of concentrated saline are not disputed. The product label warns—in red ink—that the product is 14.6% sodium chloride, and that it is "CONCENTRATE," requiring "CAUTION: MUST BE DILUTED FOR I.V. USE." The product further warns of the specific mechanism of injury in the present case: that "inadvertent direct injection or absorption of concentrated sodium chloride solution may give rise to sudden hypernatremia." The product insert contains repeated warnings to this effect. The insert

8. With respect to the "double recovery" argument, the court finds it is unnecessary to resolve the issue. The defendant's argument rests on the general principle, stated in cases such as *York v. InTrust Bank*, 265 Kan. 271, 311, 962 P.2d 405, 431 (1998)—"Kansas has not varied from a rule that limits a plaintiff to only one recovery for a wrong." The plaintiff has countered that this rule has no application in cases involving comparative fault, and that the Kansas Supreme Court has refused to allow a *pro tanto* credit for prior settlements with alleged tortfeasors. *Glenn v. Fleming*, 240 Kan. 724, 732 P.2d 750 (1987). As the defendant points out, *Glenn* involved an action in which plaintiff obtained a *partial* settlement. Abbott suggests a different result should prevail when the evidence demonstrates that plaintiff has already obtained a full settlement. No Kansas case directly addresses the issue.

states that "[s]odium overload can occur with intravenous infusion of excessive amounts of sodium-containing solutions." (Ex. 1 at 4.) The product "must be diluted before infusion to avoid a sudden increase in the level of plasma sodium." (Id.) The 14.6% solution

is hypertonic and must be diluted prior to administration. Inadvertent direct injection or absorption of concentrated sodium chloride solution may give rise to sudden hypernatremia and such complications as cardiovascular shock, central nervous system disorders, extensive hemolysis, cortical necrosis of the kidneys and severe local tissue necrosis (if administrated extravascularly).

(Def. Ex. 1 at 3).

The treating physician of plaintiff testified that "I didn't have to have the FDA tell me that there's a risk of this. I—if you asked me when I was a second year medical student if administering 14 percent sodium chloride solution would harm someone, I would say absolutely. Direct intravascular administration is harmful." Plaintiff's expert, Dr. Milley, testified that Abbott's package insert sufficiently informed any medical professional who read it that 14.6% sodium chloride "is not supposed to be directly injected into anybody." (Def. Uncontr. Fact ¶ 12.) Nurse Diltz has admitted that she made a mistake and her "thought process did not continue on where it should." (Diltz Dep. July 13, 1994, at 472).

■ Plaintiff has made no contention in the present action that the product label and insert are defective in themselves. Plaintiff does argue that Abbott violated a duty when it received a copy of the FDA Palmer letter but "ignored" it. (Resp. at 60). The evidence does not support plaintiff's argument.

As discussed earlier, the FDA *never sent the Palmer letter to Abbott.* The letter was instead sent to only three manufacturers of a more concentrated form of saline. The plaintiff's repeated reference to Abbott's "receiving" a copy of the Palmer letter is an attempt to obscure this simple fact. Abbott received a copy of the letter only indirectly, when counsel for plaintiff in a separate action showed a copy of the letter to Abbott's Director of Regulatory Affairs during a deposition.

Nor does the evidence permit the characterization of Abbott as "ignoring" the Palmer letter. After first learning of the letter, Abbott wrote to the FDA to state that it had not received a copy of the Palmer letter, and notified the FDA that it proposed changing the label on its saline product. The FDA replied by approving Abbott's labeling, requesting only minor changes to the shipping carton. The FDA never asked Abbott to send the Palmer letter to its customers.

Abbott also seeks summary judgment based upon its argument that its warning was adequate under the circumstances of the case. Specifically, it relies on Restatement (2d) of Torts, § 402A, comment j, which provides:

In order to prevent the product from being unreasonably dangerous, the seller may be required to give directions or warning, on the container, as to its use.... Where warning is given, the seller may reasonably assume that it will be read and heeded; and a product bearing such a warning, which is safe for use if it is followed, is not in defective condition, nor is it unreasonably dangerous.

*See Wheeler v. John Deere Co.,* 862 F.2d 1404, 1413 (10th Cir.1988).

The plaintiff responds by contending that Nurse Diltz's failure to read the label of the saline package should be viewed as a "foreseeable misuse" which Abbott was required to warn against. The plaintiff's argument is premised on the conclusion reached in *Wheeler,* 862 F.2d 1404, 1413 (10th Cir.1988), by which the court held that the manufacturer of a combine had not given an adequate warning of injury to an agricultural worker, who inserted his hand in an auger clean-out door, by attach-

ing a warning decal to the combine some two feet behind the clean-out door.[9] The plaintiff contended that the defendant's warning decal was defective because there was "the need for a new warning decal placed directly next to the vertical auger clean-out door." 862 F.2d at 1411.

■ In the present case, by contrast, Wesley's personnel are trained health care professionals who have acknowledged the danger of giving medication without checking the labels. The uncontroverted evidence establishes Wesley's medical personnel are repeatedly trained to check—and recheck—the content and dosage of medication. The evidence establishes that Abbott's warnings were not concealed or hidden on some remote part of a large piece of machinery. They were clearly emblazoned on the package label and repeatedly stated on the package insert. It is established as uncontroverted that the package containing the sodium chloride solution which injured the plaintiff was replete with warnings of the dangers of administration without dilution—which is precisely the mechanism of injury to the plaintiff.

Defendant also seeks summary judgment under the provisions of the Kansas Product Liability Act ("KPLA") K.S.A. 60–3301 et seq. Specifically, Abbott invokes the protection of K.S.A. 60–3305, which limits a manufacturer's duty to warn in certain circumstances. The statute provides:

In any product liability claim any duty on the part of the manufacturer or seller of the product to warn or protect against a danger or hazard which could or did arise in the use or misuse of such product, and any duty to have properly instructed in the use of such product shall not extend:

> (a) To warnings, protecting against or instructing with regard to those safeguards, precautions and actions which a reasonable user or consumer of the product, with the training, experience, education and any special knowledge the user or consumer did, should or was required to possess, could and should have taken for such user or consumer or others, under all the facts and circumstances;
>
> . . . .
>
> (c) To warnings, protecting against or instructing with regard to dangers, hazards or risks which are patent, open or obvious and which should have been realized by a reasonable user or consumer of the product.

Applying this statute, the Kansas Court of Appeals has written:

> There is no duty to warn of dangers actually known to the user of a product, regardless of whether the duty rests in negligence or on strict liability. *Long v. Deere & Co.*, 238 Kan. 766, 773, 715 P.2d 1023 (1986).

A product is not unreasonably dangerous when its degree of danger is obvious

---

9. Under Kansas law, manufacturers have a duty to warn of dangers of harmful effects arising from the foreseeable use and misuse of a product that are known or are readily foreseeable in the state of art. In any given case, plaintiff's evidence must sufficiently demonstrate that the harm incurred should have been reasonably foreseeable to the manufacturer of the product. *Richter v. Limax International*, 45 F.3d 1464, 1471 (10th Cir.1995).

In *Wheeler*, the manual use of the combine auger clean-out door was foreseeable because "trial testimony indicated that it was impossible to completely unclog the combine without removing the clean-out door and engaging the vertical auger." 862 F.2d at 1407. Manual cleaning was foreseeable because no other apparent method existed to perform this vital maintenance function; indeed, the jury was presented with evidence that Deere's engineers used this same method. Several of Wheeler's witnesses were experienced farm workers who testified upon belief that it was safe to clean the 7720 combine's vertical auger and sump while the engine was running. All expressed surprise about the manner in which they were injured. *Wheeler v. John Deere Co.*, 935 F.2d 1090, 1104 (10th Cir.1991).

and generally known or recognized. *Wheeler v. John Deere Co.*, 862 F.2d 1404, 1413 (10th Cir.1988). "If a danger is obvious, then its obviousness constitutes a warning, and the product seller's failure to provide a separate warning should not constitute a defect." Westerbeke, Some Observations on the Kansas Product Liability Act (Part 2), 54 J.K.B.A. 39, 44 (1985). *Miller v. Lee Apparel Co. Inc.*, 19 Kan. App.2d 1015, 1030, 881 P.2d 576 (1994). *See also Kerns v. G.A.C., Inc.*, 255 Kan. 264, 273, 875 P.2d 949 (1994) (holding that in addition to protection accorded by state statute of repose, installer of fence surrounding closed swimming pool "had no duty to warn because the danger or hazard alleged was open or obvious which should have been realized by a reasonable user of the product. K.S.A. 60–3305."). Citing 60–3305(c), the Tenth Circuit observed in *Neff v. Coleco Industries*, 961 F.2d 220, 1992 WL 83534 (10th Cir.1992), that "[u]nder Kansas law, there is no duty imposed on a manufacturer or seller to warn or protect against 'dangers, hazards or risks which are patent, open or obvious and which should have been realized by a reasonable user or consumer of the product.'"

Abbott contends that, under this provision, it was not required to give notice to Wesley medical personnel of the dangers of inadvertent injections of concentrated saline, since Wesley was a "sophisticated user," and since the dangers of such injections are an obvious danger. The plaintiff presents no credible argument Wesley personnel were not sophisticated users within the meaning of K.S.A. 60–3305(a), nor could such an argument be made in light of the evidence submitted in connection with the motion for summary judgment.

The director of Wesley's Pharmacy Department testified that he was aware of the risks associated with inadvertent administration of concentrated sodium chloride. He had read Abbott's package insert, and knew prior to the time of the accident involving the plaintiff that there was a risk of serious adverse reaction if a newborn was given concentrated saline. He further testified that there was a risk of medication error if solutions were diluted out on the floors, and that there were procedures for restricting access to products within Wesley. The hospital's P & T Committee knew before the accident that floor stocking medications can increase the risk of errors. Ultimately, the committee deferred to the medical director of the affected nursing area whether there was a medical need to floor stock medication. Dr. Bloom testified that changing the floor stocking policy would have been "irrational" without an adequate substitute to ensure that the product was on the floor when he wanted it there.

■ Nor is there any evidence that any medical practitioner was unaware of the dangers of concentrated sodium chloride, or of the fact that medication errors involving such solutions can and do occur in hospitals. The danger presented by concentrated sodium chloride has been acknowledged by numerous witnesses. "Kansas law does not impose a duty to warn of dangers actually known to the product user, or of obvious common dangers or generally known risks connected with the use of the product." *Duffee By & Through Thornton v. Murray Ohio Mfg.*, 879 F.Supp. 1078, 1082 (D.Kan.1995) (citations omitted), *aff'd*, 91 F.3d 1410 (10th Cir.1996).

■ Finally, there is also a basis for finding that, even if Abbott had a duty to forward the Palmer letter to its customers, fulfilling that duty would not have prevented the injury to the plaintiff. That is, the alleged failure to warn was not the proximate cause of plaintiff's injuries. Proximate cause is "that cause which in natural and continuous sequence, unbroken by an efficient intervening cause, produces [an] injury and without which the injury would not have occurred, the injury being the natural and probable consequence of the

wrongful act." *Wilcheck v. Doonan Truck & Equip.*, 220 Kan. 230, 235, 552 P.2d 938 (1976) (citations omitted).

Here, the plaintiff's injuries were caused when Nurse Diltz, although certainly aware that an infant should not be directly injected with 14.6% concentrated sodium chloride and, by her own admission, simply stopped thinking and failed to read the label clearly identifying the product as 14.6% concentrated sodium chloride. There is no evidence that, had Abbott forwarded a copy of the Palmer letter to Wesley, Wesley would have altered its floor stocking policy. Indeed, the evidence is entirely to the contrary. Wesley personnel knew that dispensing medications from floor stock could create an additional risk of medication errors. From September 1991, Wesley classified concentrated sodium chloride (3% or greater) as a restricted drug with guidelines for its use because it posed a risk of, among other things, hypernatremia in the event of a medication error. The decision to floor stock concentrated sodium chloride was made after weighing the risk of medication error against its patients' medical needs.

As noted previously, Dr. Bloom, plaintiff's neonatologist and the Director of NSCU in 1992, testified that the Palmer letter was not "a very helpful letter" and that it did not "strike [him] as something [he] would react to or respond to in the daily course of business." Dr. Bloom testified that he knew the risks set forth in the letter already, and that "the letter is not new information to me." He viewed the information in the Palmer letter as "in no way helpful to any of us." (Bloom Dep. at 27–28). He does not believe Wesley would have responded to the letter. (Id. at 31). He "didn't have to have the FDA tell [him] that there's a risk" of inadvertent injection of undiluted saline. (Id. at 69).

Wesley's Director of Pharmacy Services has testified that if he had received a letter like the Palmer letter, he would have shared it with his staff and the pharmacy chairman, but that they may have decided no action was necessary. He testified that when he received additional warning information, he would review it and determine what action to take on it, but would not feel obligated to follow recommendations from manufacturers or the FDA. The evidence is that, before November, 1992, it was not logistically possible for Wesley to restrict concentrated sodium chloride solution to the pharmacy and get it to all patients in what the medical staff felt was a timely manner. The hospital did not have a 24–hour pharmacy service for I.V. admixtures, nor did it have an automated delivery system that would have maintained stock for floor distribution.[10] Even after Wesley reorganized its system making central pharmacy responsible for all I.V. admixtures, nurses continued to dilute some electrolytes and other drugs on the floor. The nurses in the hospital's NICU continue to this day to handle vials of 14.6% sodium chloride, and dilute the solution for electrolyte balancing in newborns.

The evidence here is that, even after the Eric Wright incident, Hurst reviewed the floor stocking policy, and decided it should not be changed. He reached this conclusion after interviewing Dr. Bloom, Ella Hamilton and Cindy Harmon. Nurse Harmon has testified that "regardless of where the drug is located, it's incumbent upon the person that is getting the drug for use to look at the label and make certain that he or she has the right drug." (Harmon Dep. at 35). Dr. Bloom has testified that there is often a need for "immediate access to electrolytes ... and to withdraw that capability didn't seem like a rational thing to do." (Bloom Dep. Feb. 8, 1999, at 25–26). Hurst has acknowledged there is an "additional element of risk" in floor stocking certain items, but this "has to be weighed against the patients' and the

---

**10.** According to Hurst, the logistics for such a system were not available at Wesley until late 1993 or early 1994.

physicians' needs." (Hurst Dep. Sept. 29, 1998, at 122–23).

In light of the evidence before it, the court finds that the alleged failure of Abbott in not supplying Wesley with information contained in the Palmer letter was not the proximate cause of any injury to the plaintiff.

### Conclusion

██ The plaintiff's underlying argument is that drug manufacturers have a duty not merely to provide adequate product warnings, but to also warn learned intermediaries, skilled health care professionals, of the dangers of ignoring otherwise adequate warnings. This argument is not supported in the law. The plaintiff has cited not a single authority for holding that a drug manufacturer has such a duty.

It is, in fact, contrary to the law. As the court wrote in *Humes,*

> *it is the physician's duty to inform himself or herself of the characteristics of the drugs* prescribed and to exercise his or her judgment of which drug to administer in light of the drug's propensities and the patient's susceptibilities. *The learned intermediary rule allows a drug manufacturer to assume a patient places reliance on the physician's judgment and relieves the manufacturer of a duty to assist the physician in communicating with patients.*

*Humes v. Clinton,* 246 Kan. at 600–01, 792 P.2d 1032 (emphasis added). The plaintiff's theory of the case would effectively negate the learned intermediary doctrine, since a defendant manufacturer could never be sure that the health practitioner—like Nurse Diltz here, working under the supervision and employment of Wesley Hospital—won't have thinking processes

which just stop, and who simply fail to look at otherwise adequate labels.[11]

IT IS ACCORDINGLY ORDERED this 16th day of August, 1999, that the defendant's motion for summary judgment (Dkt. No. 118) is hereby granted; the plaintiff's supplementary motions (Dkt.Nos. 145, 146) are denied; the plaintiff's motions to amend the pretrial conference order (Dkt.Nos. 141, 144) are denied as moot.

---

11. A motion for reconsideration is disfavored. In the present case, the court must note both the extensive briefing previously submitted by the parties, both in the pleadings directly submitted to the court and the requested surreply (See infra, at n. 1). Given this full opportunity to present all issues relating to the case, any motion for reconsideration shall not exceed 15 double-spaced pages in length, and shall not repeat any argument or restate facts which were previously submitted to the court in the pleadings referenced above. A response to any such motion shall not exceed 10 pages. No reply will be filed.